302 Ga. 488
FINAL COPY

S17A1298.  JONES v. THE STATE.

BENHAM, Justice.

Appellant Marlon Jones appeals his convictions stemming from the death of his daughter Jania Parker-Jones.[1]  In his assertions of error, appellant contends the evidence was insufficient to convict, his trial counsel rendered constitutionally ineffective assistance, and the trial court abused its discretion by failing to grant a mistrial.  For the reasons set forth below, we affirm on the merits and vacate in part to correct a sentencing error.

1.  (a) Viewed in a light most favorable to upholding the jury's verdicts, the evidence shows as follows.  At the time of the events in question, appellant had four children: a ten-year-old daughter, two toddlers

---

[1] The crimes occurred on or about March 10-11, 2012.  On March 6, 2013, a Clayton County grand jury indicted appellant on three counts of felony murder, aggravated battery, aggravated assault, cruelty to children in the first degree, two counts of "cruelty to children," cruelty to children in the second degree, and contributing to the deprivation of a minor.  Appellant was tried from October 21-25, 2013, with the jury acquitting appellant of two felony murder counts, aggravated battery, aggravated assault, and cruelty to children in the first degree; but returning verdicts of guilty on the remaining counts for which he was indicted.  On October 29, 2013, the trial court sentenced appellant to life in prison for felony murder plus a number of years.  Appellant moved for a new trial on December 2, 2013, and amended his motion on August 22, 2014, and on July 18, 2016.  The trial court held hearings on the motion for new trial, as amended, on September 30, 2016, and on October 11, 2016.  The trial court denied the motion as amended on October 14, 2016.  Appellant timely filed a notice of appeal and, upon receipt of the record, the case was docketed to the April 2017 term of this Court and submitted for a decision to be made on the briefs.

— a boy and a girl, and the victim who had just turned a year old. At any given time, three of the children lived with appellant in his house.[2] The children all went to the same daycare facility. The daycare owner testified that appellant was a good parent, but that his demeanor changed shortly after obtaining custody of the victim. The daycare owner stated appellant cursed at her over the phone and in person when she attempted to address health concerns relating to the victim[3] such that she eventually banned appellant from the property. Appellant's children remained enrolled at the daycare, but were dropped off or picked up by someone other than appellant. On two occasions in January 2012, the victim's daycare teacher noted the victim had some bruises on her body; however, no one from the daycare center contacted authorities regarding those injuries. The victim's pediatrician testified the victim was healthy as of her last "well baby" visit on March 6, 2012, which was five days before her death.

At trial, appellant's eldest daughter testified that on the night of March 10, 2012, she and her toddler brother were in her room watching television

---

[2] The two toddlers were the children of appellant and his girlfriend Marshana Saddler. According to Saddler's testimony, she and appellant would alternate custody of each of the toddlers every other week. On the night in question, appellant had the victim, the ten-year-old, and his toddler son at his house. His toddler daughter was at Saddler's house.

[3] On one occasion, the victim had a fever and on the other occasion, in October 2011, the victim had a severe diaper rash.

while appellant was in his bedroom with the victim. The daughter said she heard a bump and then heard the victim crying. The daughter said it sounded like the victim had fallen onto the floor. According to an investigator, who testified at trial, the daughter said she ate some cereal that night around 10:00 after hearing the bump and the victim's cry. The daughter said she fell asleep and was later awakened by appellant telling her to get dressed. In the early morning hours of March 11, appellant gathered the children into his truck and drove to the house of his girlfriend Marshana Saddler. Before leaving appellant's house to go to Saddler's home, the daughter said she touched the victim and noticed she was not breathing.

Saddler testified that she and appellant lived within 10 to 15 minutes of each other. On March 11, she said she was awakened by the arrival of appellant and the children at 4:49 a.m. She said she dressed in about five minutes and then she, appellant, and all four children got into her minivan to drive to the hospital.

The emergency room registration clerk who first encountered appellant when he brought the victim to the hospital, testified that appellant told her the victim had fallen from a dressing table. He also told the registration clerk the victim had fallen from his arms to the floor. An emergency room nurse

3

testified appellant walked into the hospital at about 4:55 a.m. The nurse said the victim was not breathing and her jaw was stiff, indicating that rigor mortis had already set in. The nurse said the victim had blood in her mouth and nostrils, a bruise on the back of her right ear, and a large hematoma on the top of her head. Although life-saving measures were attempted, the victim could not be revived and was pronounced dead. At that point, the nurse said she called the police, who arrived at the hospital at about 5:25 a.m.

As part of investigating the victim's death, the police searched Saddler's minivan and appellant's house. Nothing of evidentiary value was found in the minivan. An officer testified that when searching appellant's bedroom, there was a strong odor of vomit. The police found a fitted bedsheet which appeared to have vomit on it; some bedsheets which appeared to have blood on them; and a playpen blanket which appeared to have fecal matter on it. In addition, an officer testified that the playpen, which is where the victim slept, had a strong smell of vomit.

The State's expert medical examiner testified the cause of the victim's death was blunt force trauma to the head and the manner of death was homicide. The victim's autopsy revealed a large amount of bruising on the right side of her scalp; bruising on the corner of her right eye; hemorrhaging

4

around the optic nerves; hemorrhaging in the retinas; a skull fracture; hemorrhaging on the brain's surface; and bruising of the brain. The medical examiner opined that the victim's head had been impacted four times. She said the victim's injuries were consistent with a high energy impact and inconsistent with a household fall. She also noted that vomiting would be a manifestation of head trauma and testified that, based on the cells forming around the victim's injuries, it was likely the victim was alive for three hours following the trauma.

Appellant took the stand at trial, testifying he had the victim in his arms and was on his way from his bedroom to the kitchen to get a diaper when he tripped and fell with the victim, dropping her. He said the victim hit the wall and then fell to the floor. He picked the victim up, she cried and then stopped. He changed the victim's diaper, put the victim in her playpen with a bottle of milk that she did not drink, and then fell asleep. Appellant woke up in the early hours of the morning and when he checked on the victim, he saw she had blood in her nostrils. At that point, he woke up the other children, made sure they dressed, and drove with the three children to Saddler's house. Appellant admitted he did not call 911 from his house although he had a working phone; admitted he passed at least one fire station on the way to

Saddler's house; and admitted that he did not heed Saddler's admonitions to call an ambulance when he arrived at her house. Appellant told his eldest daughter that he was afraid he would get into trouble regarding the victim.

(b) The jury returned verdicts of guilty on the counts of felony murder, predicated on cruelty to children in the second degree for failing to obtain medical treatment for the victim; deprivation of a minor for failing to obtain medical treatment for the victim; and two counts of "cruelty to children" for maliciously causing the victim excessive pain.[4] Appellant contends the evidence was insufficient to convict because the incident was an accident and he took the victim to the hospital. We disagree. First, appellant was not convicted of deprivation of a minor because the guilty verdict on that count merged for sentencing purposes. Second, the evidence supported the crimes for which appellant was convicted. Appellant's oldest daughter heard a bump and the infant cry sometime before 10:00 on the evening of March 10. Appellant testified that he tripped and fell, causing the victim to fall, hitting the wall and the floor. He put the victim to bed and went to sleep. The medical examiner said the victim was alive for approximately three hours after experiencing the trauma to her head. In addition to the physical

---

[4] These last two counts related to the bleeding of the victim's brain and the hemorrhaging of her retinas.

evidence revealed in the autopsy, it was evident that the victim experienced head trauma because of the vomit in appellant's bedroom. Rather than calling 911 or driving immediately to the hospital in the early morning hours of March 11 when appellant said he observed blood coming from the victim's nostrils, appellant drove 10 to 15 minutes to his girlfriend's house, passed a fire station on the way there, ignored his girlfriend's admonitions to call an ambulance, and then drove to the hospital. Appellant's oldest daughter noted the victim was not breathing before appellant drove the children to his girlfriend's house, and appellant made an admission to his daughter that he believed he was in trouble. In addition, the medical examiner testified the victim sustained four impacts to her head and the injuries sustained were inconsistent with a household fall. A rational jury was authorized to reject appellant's defense that the victim's injuries were accidental and authorized to find that appellant maliciously caused cruel and excessive physical pain to the victim and unreasonably failed to obtain medical treatment for the victim after the injuries occurred, thereby proximately causing her death. See Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979); Castro v. State, 295 Ga. 105 (1), (3) (757 SE2d 853) (2014); Brown v. State, 292 Ga. 454 (1) (738 SE2d 591) (2013).

7

(c)  The crimes at issue were committed in 2012 and appellant was sentenced in 2013.  Prior to 2014, the sentences for causing a death, including a death caused by cruelty to children in the second degree, were imprisonment for life (with the possibility of parole), imprisonment for life without parole, or death.  See OCGA § 16-5-1 (d) (2011).  Effective July 1, 2014, the legislature amended OCGA § 16-5-1 to create the offense of murder in the second degree and to make the sentence for a death caused by cruelty to children in the second degree no less than ten years and no more than 30 years in length.  See OCGA § 16-5-1 (d) and (e) (2); Ga. L. 2014, p. 444, § 1-1.  Appellant argues he is entitled to be resentenced in accordance with this amendment.  However, since the General Assembly did not make the amendments to OCGA § 16-5-1 retroactive, appellant was properly sentenced in conformity with the law as it was when the crime was committed.  See Fleming v. State, 271 Ga. 587, 590 (523 SE2d 315) (1999) ("[A] crime is to be construed and punished according to the provisions of the law existing at the time of its commission.").

(d)  There is a merger error concerning Counts 7 and 8, which are the two counts of "cruelty to children," for which the jury returned verdicts of guilty.  Because there was no evidence of a deliberate interval of time

8

between the acts of cruelty causing bleeding of the victim's brain (Count 7) and causing retinal hemorrhages (Count 8), the trial court erred when it sentenced appellant on both of these counts. See Gomez v. State, 301 Ga. 445 (4) (c) (801 SE2d 847) (2017). Rather, one of these counts should have merged into the other for sentencing purposes. Id. Accordingly the conviction for Count 8 is vacated.

2. Appellant contends trial counsel rendered constitutionally ineffective assistance when he failed to object to leading questions posed by the State to its witnesses and when he failed to secure a medical expert. In order to prevail on a claim of ineffective assistance of counsel, appellant

> must show counsel's performance was deficient and that the deficient performance prejudiced him to the point that a reasonable probability exists that, but for counsel's errors, the outcome of the trial would have been different. A strong presumption exists that counsel's conduct falls within the broad range of professional conduct.

(Citations and punctuation omitted.) Pruitt v. State, 282 Ga. 30 (4) (644 SE2d 837) (2007). If a defendant fails to meet his burden on one prong of the two-prong test, then the other prong need not be reviewed by the Court. Wright v. State, 291 Ga. 869 (2) (734 SE2d 876) (2012). Appellant has failed to show counsel was constitutionally ineffective.

9

(a) At the motion for new trial hearing, trial counsel testified that it is his practice not to object to leading questions if they pose no harm to his client and if they move the trial along. A reasonable attorney would have thought that the leading questions did not pose any harm to his client. Since trial counsel's decision not to object to leading questions was a matter of strategy and not outside the broad range of reasonable professional conduct, we cannot say his performance was deficient. See Williams v. State, 282 Ga. 561 (5) (a) (651 SE2d 674) (2007) ("An attorney's decision to forego objecting to . . . leading questions used to establish routine points constitutes reasonable trial strategy."); Christian v. State, 277 Ga. 775 (2) (596 SE2d 6) (2004).

(b) The record shows trial counsel made an attempt to secure a medical expert to testify at trial, but found out days before trial was to commence that the expert he was pursuing was not a viable option for testifying on behalf of the defense. Trial counsel moved for a continuance on the first day of trial for the express purpose of finding another expert, but the trial court denied the motion. At the motion for new trial hearing, appellant presented an expert medical witness who agreed with the State's expert medical examiner that the victim's death was caused by blunt force trauma to the head. As to

the manner of death, appellant's medical expert testified that he could not rule out an accidental manner of death; however, he also testified that he could not rule out a non-accidental manner of death. Given the equivocal nature of the testimony of appellant's proffered medical expert, appellant has failed to meet his burden of showing that there was a reasonable probability the outcome of the trial would have been different had his trial counsel been able to secure an expert in a timely manner to testify at trial. See Richardson-Bethea v. State, 301 Ga. 859 (2) (804 SE2d 372) (2017). Accordingly, appellant's claim of ineffective assistance cannot be sustained.

3. Appellant alleges the trial court erred when it failed to grant appellant's request for a mistrial. The record shows that a break was taken during appellant's cross-examination of the State's expert medical examiner. During the break, the prosecutor was seen talking to the medical examiner, and trial counsel raised the matter outside the presence of the jury. The trial court allowed appellant and the prosecutor to voir dire the medical examiner as to what transpired during the break. In sum, during the conversation at issue, the prosecutor confirmed the medical examiner's testimony that the victim's head was impacted four times; discussed a possible scheduling conflict; and discussed the manner in which defense counsel was asking

11

questions — namely that, although the medical examiner stated she had no problem with defense counsel's questions, the prosecutor had a legal basis for positing his objections. Defense counsel moved for a mistrial, not based on the "nature" of what was discussed, but based on the "stark difference" between the medical examiner's responses when she was questioned by defense counsel and her responses when she was questioned by the prosecutor. According to defense counsel, the "stark difference" in "explanation tends to suggest that something further was discussed…." The State argued there were no grounds for a mistrial because there was no coaching of the witness or other impropriety.[5] The trial court denied the motion for mistrial, but advised defense counsel he could, in front of the jury, ask the medical examiner about the conversation she had with the prosecutor; however, defense counsel declined to do so and simply renewed his request for a mistrial. When the jury returned from break, defense counsel continued his cross-examination of the medical examiner.

---

[5] There was some discussion among the trial court and counsel for the parties that the rule of sequestration had been violated. That rule, however, was not implicated because there was no allegation that the medical examiner was in the courtroom while other trial witnesses were testifying or that the medical examiner colluded with another trial witness to shape or fabricate testimony. See, e.g., Davis v. State, 299 Ga. 180 (2) (a) (2) (787 SE2d 221) (2016) ("'[T]he purpose of the sequestration rule is to prevent the shaping of testimony by one witness to match that of another, and to discourage fabrication and collusion.' [Cit.]").

Whether to grant a mistrial is a matter of the trial court's discretion. Jackson v. State, 292 Ga. 685 (4) (740 SE2d 609) (2013). The trial court's ruling on a motion for mistrial will not be disturbed unless there is a showing that a mistrial is essential to the preservation of the right to a fair trial. Id. at 689. Whether the prosecutor improperly coached the witness was a question of fact, and there was sufficient evidence to support the trial court's finding on that point. Appellant's right to a fair trial was not impacted as trial counsel was able to conduct a thorough and sifting cross-examination of the medical expert after the break. The trial court did not abuse its discretion when it declined to call a mistrial.

Judgment affirmed in part and vacated in part. All the Justices concur.

Decided October 30, 2017.

Murder. Clayton Superior Court. Before Judge Simmons.

Darrell B. Reynolds, Sr., for appellant.

Tracy Graham Lawson, District Attorney, Elizabeth A. Baker, Kathryn L. Powers, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Scott O. Teague, Assistant Attorney General, for appellee.