303 Ga. 441
FINAL COPY

S17A1873.  DREWS v. THE STATE.

BENHAM, Justice.

Appellant Herbert Drews was convicted of crimes related to the death of James David Ayers, who was a 70-year-old man, and the aggravated battery of Troyce Warren.[1]  For the reasons set forth below, we affirm.

1.  Appellant alleges the evidence was insufficient to show that he was an active participant in the crimes at bar.  Viewed in a light most favorable to

---

[1] The crimes occurred on February 5, 2012.  On February 1, 2013, a Bartow County grand jury indicted appellant on charges of malice murder of Ayers (two counts), felony murder (aggravated battery of Ayers), felony murder (aggravated assault of Ayers), aggravated battery upon a person over the age of 65 (Ayers), aggravated assault upon a person over the age of 65 (Ayers), aggravated battery (Troyce Warren), aggravated assault (Troyce Warren), burglary (intent to commit a theft), burglary (intent to commit aggravated battery), and burglary (intent to commit aggravated assault). The burglary charges were nolle prossed on November 18, 2013.  Appellant was tried before a jury from November 18-21, 2013, with the jury returning verdicts of guilty on all remaining counts in the indictment.  The trial court sentenced appellant to life in prison for one count of malice murder and purported to merge therein the other count of malice murder and the two counts of felony murder.  The trial court also sentenced appellant to 20 years imprisonment for the charge of aggravated battery (Troyce Warren) to be served consecutively to the life sentence.  The remaining counts of aggravated battery and aggravated assault were appropriately merged for sentencing purposes.  Appellant moved for a new trial on November 27, 2013, and filed an amended motion for new trial on March 13, 2017, March 14, 2017, and March 17, 2017.  Upon conducting a hearing, the trial court denied the motion for new trial, as amended, on May 3, 2017. Appellant filed a notice of appeal on May 12, 2017.  Upon receipt of the record, the case was docketed to the August 2017 term of this Court.  The Court heard oral argument on October 2, 2017.

upholding the jury's verdicts, the evidence shows as follows. Appellant and Ayers, whose nickname was "Lucky," had lived together in a single-wide, two-bedroom mobile home ("the house") in Bartow County. Although the two were unrelated, appellant described his relationship with Ayers as that of a son. Ayers was an altruistic man, who allowed numerous people to live in the house rent-free. Ayers was also known to keep at least $1,000 to $1,500 in cash on his person and would pay for food and other things for the residents in the house. On February 5, 2012, the following people were living in the house: Ayers, Jamie Gatlin, Robert Miller,[2] Ken "Goose" Coffman,[3] Becky Sears,[4] and Troyce Warren.[5] Although appellant's name was still on the lease, he had not been living at the house for at least a month prior to February 5, and he testified at trial that he had not been at the house at all for the two-and-a-half weeks preceding the incident. At the time he was last at the house, appellant stated that he and Ayers had agreed that Warren was not to live there, although apparently Warren sometimes spent the night with Sears.

---

[2] Gatlin and Miller were in a romantic relationship.

[3] At the time of trial, Ken "Goose" Coffman was deceased.

[4] Sears is Miller's sister.

[5] Sears and Warren were in a romantic relationship.

On the night in question, most of the house's occupants had gone to bed. Ayers had a room on one end of the house and Gatlin and Miller occupied the second bedroom at the opposite end of the house. Goose Coffman was watching television on the couch in the living room, which was also where he slept. Sears and Warren were in a room they had constructed on the front porch during the two-and-a-half weeks immediately prior to February 5.

Appellant testified he had consumed half a pint of rum and two shots of whiskey that night. He decided to go over to the house to get his dog. Since appellant did not have a vehicle, he had his friend Barrett Muhlenbruch pick him up from Derinda Rader's[6] hotel and drive him and Rader to the house. Once they arrived, appellant exited Muhlenbruch's white truck and put his dog in the bed of the truck. Appellant said he then headed toward the house while Muhlenbruch and Rader eventually drove up the hill to visit a nearby neighbor.

Jamie Gatlin testified she heard appellant's voice and looked out of her bedroom door and saw appellant standing in the doorway to Ayers's room. Gatlin said appellant raised his voice. At that point, she closed her door and woke up Robert Miller. Soon thereafter, she said she heard hitting and kicking

---

[6] Rader had formerly lived at the house, but had moved out due to an altercation with Sears.

and, when she and Miller[7] looked out their bedroom door, they saw appellant and Troyce Warren fighting.

Becky Sears testified she heard appellant attempting to kick in the door to her room on the porch. Because the door swung outward, appellant could not kick it in and so he eventually "snatched" the door open. Sears said appellant stood in the doorway holding a knife in his hand which was covered in blood. According to Sears, appellant said "Lucky's dead and it's all y'all's f'ing fault." Appellant then attacked Warren with the knife. The two men started fighting, with the altercation moving from the porch into the living room of the house. Warren testified he beat the "dog crap out of" appellant until police arrived. Robert Miller also joined in the fight and was credited with taking the knife from appellant.

Meanwhile, Sears went to check on Ayers and found him sitting on his bed bent over, bleeding profusely. Sears screamed for assistance and then tried to stop the bleeding with towels. Gatlin entered the room and called 911 at Ayers's request. Sears left the house when Gatlin called 911 because she was the subject of an outstanding warrant. As she left the house, Sears said she saw

---

[7] Miller could not be located and did not appear at the trial.

a white truck parked outside with appellant's dog in the back and a white female and a Hispanic male inside the truck's cab. Sears said she walked up to Debbie and Gary Coffman's house,[8] which was a neighboring house at the top of the hill from the house where the incident occurred.

The first officer who arrived in response to Gatlin's 911 call broke up the fight and dragged appellant out of the house. Because Robert Miller told one of the police officers that money had been stolen from Ayers, appellant was searched, Muhlenbruch was detained and searched at the Coffmans' house,[9] and Muhlenbruch's truck was searched, but no money was ever found. Police recovered a bloody knife in a trash can in the kitchen, which is where Miller told police he placed the knife upon taking it from appellant. The knife later tested positive for appellant's blood DNA. Appellant testified that the knife was his, but he denied he was in possession of it on the night in question.[10]

---

[8] Gary Coffman and Goose Coffman were brothers.

[9] During the investigation of the stabbing, Muhlenbruch told police he drove away from the house after hearing appellant and Ayers having a heated argument. At trial, however, Muhlenbruch denied hearing anything and testified he drove up the hill as soon as appellant had exited the vehicle and put his dog in the back of the truck.

[10] According to appellant, he had left the knife in Ayers's vehicle, which he borrowed from time to time. Appellant was not in possession of Ayers's vehicle on February 5.

Eventually, appellant, who was under arrest, Warren, and Ayers were transported to the hospital for treatment of their injuries. A doctor and nurse testified appellant was treated for superficial injuries to his face. A doctor who treated appellant and Warren said that Warren's injuries were more serious than appellant's injuries, although not life-threatening. Specifically, Warren had stab wounds to his chest, his chin, and his leg. These wounds had to be closed with stitches or staples.

When Ayers arrived at the hospital, he was conscious, had a normal brain scan, and was treated for the nine stab wounds he received to his body. Nevertheless, doctors intubated Ayers so that his airway would not be constricted by any swelling from the stab wounds to his neck. In spite of medical intervention, the trauma of being stabbed eventually caused a series of complications leading to Ayers's death on February 9, 2012. Ayers developed atrial fibrillation or an irregular heartbeat. This condition caused him to be susceptible to blood clots and, because of the stab wounds, doctors were unable to treat him with a blood thinner. Eventually, a blood clot developed in Ayers's heart and then broke free, traveling to his brain causing a "massive" stroke. The stroke rendered Ayers comatose and caused significant brain injury from which his treating physicians determined he would not recover. Ayers's

daughter made the decision to remove Ayers from life support, and he died the next day. The medical examiner testified that the cause of death was "multiple complications and multiple sharp force injuries," and that the manner of death was homicide.

At trial, appellant took the witness stand in his own defense. He testified that after he exited Muhlenbruch's truck and began walking toward the house, he became angered at seeing the room on the porch, which had not been there when he was last at the house two-and-a-half weeks earlier. He stated he wanted to see who was behind "the wall" and so he pounded on the door and then opened it. He saw Sears reclined on the bed and Warren sitting on the bed. He said when he saw Warren he asked, "What the f**k are you doing here?" and then said, "No f**king way." Appellant stated that Warren responded to him by asking him what he was going to do about it. At that point appellant said he headed toward the front door of the house, but could not remember exactly what happened next. He acknowledged there was a fight, testified that he was in and out of consciousness during the fight, and said that Warren beat him, Sears stomped on his back, and Miller hit him. He also stated that Miller asked him, "Where is the money?" Appellant denied ever seeing Ayers that night and said he learned of Ayers's death while in jail. Appellant

admitted that he had been drinking and that no one in the house knew he was coming over to get his dog that night.[11]

The jury was authorized to discredit appellant's testimony that he never saw Ayers on the night in question and to reject appellant's theory that Troyce Warren actually stabbed Ayers and that the other occupants of the house were in on it to steal money from Ayers. See Jones v. State, 302 Ga. 488 (1) (b) (807 SE2d 344) (2017). The evidence summarized above was otherwise sufficient to authorize a rational trier of fact to find appellant guilty beyond a reasonable doubt of the crimes for which the jury returned verdicts of guilty. Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Appellant contends trial counsel rendered constitutionally ineffective assistance when he failed to investigate allegations raised by a supplemental police report and attendant dashboard camera video. In order to prevail on a claim of ineffective assistance of counsel, appellant

> must show counsel's performance was deficient and that the deficient performance prejudiced him to the point that a reasonable probability exists that, but for counsel's errors, the outcome of the trial would have been different. A strong presumption exists that

---

[11] In fact, appellant said he called Ayers earlier in the day and told Ayers he would be picking up the dog the next day after work. Appellant said he never called Ayers back to tell him he had changed his mind and was coming over that night to retrieve the dog.

counsel's conduct falls within the broad range of professional conduct.

(Citations and punctuation omitted.) Pruitt v. State, 282 Ga. 30 (4) (644 SE2d 837) (2007). If a defendant fails to meet his burden on one prong of the two-prong test, then the other prong need not be reviewed by the Court. Wright v. State, 291 Ga. 869 (2) (734 SE2d 876) (2012).

The record of the motion for new trial proceedings shows as follows. On August 26, 2012, Troyce Warren's estranged wife Molly Warren spoke with Deputy Lisa Fuller of the Bartow County Sheriff's Department. The meeting was recorded by the dashboard camera of Deputy Fuller's vehicle and memorialized in a report authored by Deputy Fuller. The report was placed in the investigative file regarding Ayers's death and provided to trial counsel as part of discovery. The video recording, on the other hand, was referenced by number in Deputy Fuller's report, but apparently a copy was not placed in the discovery file.[12]

During the conversation, Molly Warren played for Deputy Fuller a recorded cell phone conversation of herself and a woman named Tina James.

---

[12] Since the dashboard camera video was referenced by number in Deputy Fuller's report, which was in the discovery file and trial counsel stated he and co-counsel reviewed the discovery file, appellant could have obtained the video with reasonable diligence. As such, there was no violation under Brady v. Maryland, 373 U. S. 83 (83 SCt 1194, 10 LE2d 215) (1963).

This cell phone recording cannot be heard on the dashboard video recording, but Deputy Fuller summarized what she heard of the recording in her written report as follows:

> In the recording a female is stating they (Troyce [Warren] and Becky [Sears]) struck Lucky in the throat so he could not make noises. The female stated (Herbert) Drew[s] came in and said[,] ["L]ook what you have done.["] The female was explaining how the police had Drew[s] on the ground looking for money and did not find it. The female stated Jamie [Gatlin] bought a car with the money.

In addition, Molly Warren told Deputy Fuller that she "guessed" James had this information because she lived at the house when the stabbing took place. Molly Warren admitted she had no firsthand information about the stabbing. In the video recording, an unidentified woman standing with Molly Warren can be heard accusing Sears and Warren of committing the crime for the money.

At the motion for new trial hearing, Molly Warren testified she had no recollection of the cell phone recording of James or of her meeting with Deputy Fuller. She stated that, at the time, she was mentally ill and angry at her estranged husband Troyce Warren. According to appellate counsel, James could not appear at the motion for new trial hearing because she had suffered a stroke that rendered her unable to communicate. Trial counsel testified he

had no specific recollection of Deputy Fuller's report, but said he and his co-counsel[13] reviewed everything in the discovery file. He admitted he had not spoken to Molly Warren or Tina James in preparation for trial. Appellant contends trial counsel was ineffective for failing to investigate the matters raised in Deputy Fuller's report and the dashboard camera video.

Pretermitting whether counsel's performance was deficient for failing to investigate the matters raised in Deputy Fuller's report and the dashboard camera video, appellant has failed to show how he was prejudiced. The proffer appellant made at the motion for new trial hearing[14] constituted inadmissible hearsay — even if Molly Warren could have recalled the telephone call with James and the meeting with Deputy Fuller, she admittedly had no firsthand knowledge of the events in question; and the trial record shows James neither lived in the house with Ayers nor witnessed the events of February 5, meaning she also had no firsthand knowledge of the events in question.[15] The

---

[13] Co-counsel did not appear at the motion for new trial hearing.

[14] When alleging ineffective assistance predicated on a failure to investigate, a defendant must make a "proffer as to what a thorough investigation would have uncovered or what the essential witnesses would have said." Domingues v. State, 277 Ga. 373 (2) (589 SE2d 102) (2003).

[15] Moreover, appellant failed to make a showing that the residual exception to hearsay as set forth in OCGA § 24-8-807 was applicable in this circumstance. Although James was unavailable to testify at the motion for new trial hearing due to a medical condition, there was no evidence presented concerning James's relationship with Molly Warren that would imbue any of the

information in the report also contradicted appellant's trial testimony. For example, appellant testified he never saw Ayers on the night in question; but, according to statements attributed to James, appellant allegedly confronted Troyce Warren and Sears when he said "[L]ook what you have done," a statement which implies appellant saw Ayers that night. Since appellant failed to show that the outcome of his trial would have been different but for counsel's assumed deficient performance, his claim of ineffective assistance cannot be sustained. See Pruitt v. State, supra, 282 Ga. at 34.

3. Appellant contends the trial court erred when it refused to admit medical records indicating Troyce Warren was diagnosed with homicidal ideations sometime after February 5, 2012. Prior to trial, the State made a motion in limine to exclude all medical records unrelated to Warren's treatment for injuries sustained on February 5. The pretrial transcript reveals appellant posited no objection and the trial court granted the State's motion in limine. When Warren testified at trial, appellant sought to admit uncertified medical records[16] showing that Warren had engaged in self-mutilation and had

---

statements attributed to James with the significant guarantees of trustworthiness necessary for the exception to apply.

[16] The prosecutor explained the records in question were obtained by the State through a subpoena to the hospital where Warren was treated on February 5. The hospital produced more medical

homicidal ideations sometime after the incident at issue. The trial court allowed appellant to ask Warren if he had ever engaged in self-mutilation, but did not allow any questioning or documentary evidence concerning homicidal ideation to be admitted. The trial court openly questioned how trial counsel intended to enter the evidence into the record if the doctor who made the diagnosis in question was not present to testify, as well as noted the fact that the medical records in question were not certified. At the motion for new trial hearing, trial counsel testified that he never tried to obtain Warren's certified medical records. Although the admissibility of the evidence under OCGA § 24-4-404 (b) ("Rule 404 (b)") was not raised or argued at the motion for new trial hearing, or raised or argued at trial, the trial court stated in its order denying the motion for new trial that the evidence in question was inadmissible under Rule 404 (b) because it would only be evidence for the purpose of showing Troyce Warren's propensity for violence.

As the trial record reflects, the trial court had concerns about the authenticity of the medical records and the fact that no one was present, namely the physician who diagnosed Warren, to testify about the diagnosis in question.

_____

records than the State requested; however, the State placed a copy of all medical records received in the discovery file. The medical records are not in the record on appeal.

The trial court's reliance on OCGA § 24-4-404 in its motion for new trial order to justify its decision after-the-fact is somewhat confusing. However, we need not, as the briefing on appeal urges us, take a deep dive into Rule 404 (b) to explore existential questions as to whether bad thoughts may constitute "other crimes, wrongs, or acts." The paramount prerequisite to admissibility of any evidence at trial, including Rule 404 (b) evidence, is that it be relevant. See OCGA § 24-4-402; Parks v. State, 300 Ga. 303 (2) (794 SE2d 623) (2016). The evidence at issue here was not relevant. First, the diagnosis of homicidal ideation was made sometime *after* the events at issue in the case. Second, the diagnosis of homicidal ideation allegedly concerns thoughts Warren had about his girlfriend and his child[17] and not any thoughts he had about Ayers. The trial court was not obligated to admit irrelevant evidence. See OCGA § 24-4-402 ("Evidence which is not relevant shall not be admissible."). Pursuant to the right for any reason rule, we conclude the trial court did not abuse its discretion when it did not admit this evidence. See Davis v. State, 287 Ga. 414 (696 SE2d 644) (2010).

---

[17] In the motion for new trial transcript, appellate counsel describes the basis of the diagnosis of homicidal ideation as a statement Troyce Warren made indicating his "wish" for his girlfriend and child to die.

4.  Appellant was indicted for and found guilty of two counts of malice murder and two counts of felony murder.  (See fn. 1, supra).  Since there was only one murder victim, the trial court could only sentence appellant for one count of murder and vacate the other counts of murder as a matter of law. See Malcolm v. State, 263 Ga. 369 (5) (434 SE2d 479) (1993).  The trial court erred when it purported to "merge" the second malice murder count and two felony murder counts into the first count of malice murder. However, since this is a mistake of nomenclature and has no effect on the sentence imposed, we need not take any action.

Judgment affirmed.  All the Justices concur, except Grant, J., who concurs in judgment only in Division 3.

Decided February 19, 2018 — Reconsideration

denied March 29, 2018.

Murder. Bartow Superior Court. Before Judge Nelson.

Veronica M. O'Grady, for appellant.

Rosemary M. Greene, District Attorney, Jana W. Allen, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General, for appellee.