**SECOND DIVISION**
**MILLER, P. J.,**
**RICKMAN and REESE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 28, 2019**

# In the Court of Appeals of Georgia

A19A0016. WEAVER v. THE STATE.

MILLER, Presiding Judge.

Following a jury trial, Tamara Nicole Weaver was convicted of two counts of second degree cruelty to children, three counts of aggravated assault, two counts of first degree cruelty to children, and three counts of aggravated battery. The trial court imposed a 60-year prison sentence with the first 30 years to be served in prison.[1] Weaver appeals from the denial of her motion for new trial. On appeal, Weaver argues that (1) the evidence was insufficient to support her convictions for aggravated battery; (2) the circumstantial evidence presented at trial was insufficient to support all of the charged crimes; (3) the trial court erred by charging the jury with the "short

---

[1] The trial court merged Weaver's second degree cruelty to children convictions with the first degree cruelty to children convictions, and merged the aggravated assault convictions with the aggravated battery convictions.

version" of the pattern instructions; and (4) her trial counsel rendered ineffective assistance. For the reasons that follow, we affirm.

Viewed in the light most favorable to the verdicts,[2] the record shows that Weaver had two sons, an infant and a six-year-old. Weaver stayed home with the baby for several weeks after he was born and noticed that he cried a lot and that it was not a "normal" cry. Weaver and her children moved in with her boyfriend when the baby was less than two months old. When Weaver returned to work, she asked her mother to take care of the baby. Weaver's mother noticed that the baby cried a lot and testified that Weaver was having problems with the baby's diet and his crying. Weaver and her boyfriend both worked from 6:00 p.m. to 4:30 a.m., and after she returned to work, Weaver got very little sleep because she took care of the baby when he cried so that her boyfriend could sleep. Weaver's boyfriend only kept the baby on a few occasions. Weaver, her boyfriend, and her mother were the baby's only caregivers.

When the baby was almost three months old, the crying got worse and Weaver, her boyfriend, and her mom decided to take him to Children's Healthcare of Atlanta (Scottish Rite hospital). A child abuse pediatrician ordered x-rays of the infant and

---

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2

the x-rays revealed numerous bone fractures, some new and others older and in the healing process.[3] The doctor also ordered a CT scan, from which he observed additional fractures to the infant's body. The doctor testified that, in total, the infant had 16 bone fractures throughout his ribs, legs, and pelvis. The doctor testified that some type of trauma to the body would be required to break the bones and that, because the fractures were of different ages, there were at least two different traumatic events that caused the infant's injuries. For the rib fractures, the most likely explanation was a "squeezing force about the chest." The doctor opined that the leg fractures were likely caused by a yanking, jerking or flailing motion, which could not be caused by the baby himself or by normal handling of the baby. To cause the pelvic fracture, a direct trauma to the pelvis would be required, and the injury could have been caused by a person punching or stomping the baby or by a heavy fall directly onto the pelvis. Tests on the infant ruled out the possibility that genetic issues, such as brittle bone disease or other medical disorders, could have contributed to the fractures. The doctor also testified that the baby's injuries were not visible from the

---

[3] The x-rays were not entered into evidence at trial, but the doctor utilized a diagram to illustrate the infant's injuries to the jury.

3

exterior of the body and that the types of fractures suffered by the infant would not typically leave any bruises or other marks on the outside of the body.

The doctor spoke to Weaver, who told him that she had no idea how this had happened and denied that anyone had caused any trauma to her son. Weaver's mother said she was not aware of the baby experiencing any falls or being dropped or handled roughly. Weaver's boyfriend told the doctor that Weaver was not getting much sleep and that the baby's crying and fussiness were wearing her down, but he did not mention any trauma to the baby.

The doctor concluded that the injuries were most consistent with physical abuse on at least two different occasions. The doctor testified that it would only take a few seconds to inflict these types of injuries and that the number one trigger for abuse in infants from two to three months old is a crying infant. The doctor also testified that it would be highly unlikely that a six-year-old would have the ability to inflict these types of injuries.

A detective with the Griffin Police Department received a call from the hospital about the infant's multiple fractures. The detective interviewed Weaver, and that recorded interview was played for the jury. In the interview, Weaver said that she could not imagine that anyone in her family would hurt her son. The detective also

4

interviewed Weaver's boyfriend, who said the baby cried a lot and that Weaver "dealt with him." He had no explanation as to what may have caused the baby's injuries. In an interview, Weaver's older son did not disclose that he had been abused or that he had seen anyone abuse his younger brother. The detective also interviewed Weaver's mother. At trial, the parties entered a stipulation, which was read to the jury, stating that law enforcement had ruled out Weaver's mother as a suspect. Weaver testified at trial that she did not squeeze or shake her baby in any way and had no idea that he had fractured bones. She further testified that she did not think that anything had happened to him and that the doctor may have made a mistake.

Weaver and her boyfriend were indicted on two counts of first degree cruelty to children, two counts of second degree cruelty to children, three counts of aggravated battery,[4] and three counts of aggravated assault. Weaver and her boyfriend were tried jointly, and the jury found Weaver guilty on all counts and her boyfriend not guilty on all counts. The trial court imposed a 60-year prison sentence with the first 30 years to be served in prison. Weaver filed a motion for new trial, which was denied by the trial court. This appeal followed.

---

[4] In the indictment, the State only alleged the severe disfigurement prong of OCGA § 16-5-24.

5

1. In her first enumeration of error, Weaver argues that the evidence was insufficient to support her convictions for aggravated battery. Specifically, Weaver argues that the State failed to prove that the victim's injuries constituted "serious disfigurement" under OCGA § 16-5-24 because they were not "visible." We disagree.

> In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to support the jury's verdict and determine if a rational trier of fact could find each essential element of the crimes charged beyond a reasonable doubt. We do not weigh the evidence or determine witness credibility. Conflicts in witness testimony are matters of credibility for the jury to resolve. And as long as there is some evidence, even though contradicted, to support each fact necessary for the state's case, the verdict will be upheld.

(Citation omitted.) *Clemons v. State*, 265 Ga. App. 825, 825-826 (1) (595 SE2d 530) (2004). Also, "[b]ecause the circumstances of each aggravated battery vary, whether disfigurement is serious is best resolved by the factfinder on a case-by-case basis. Consequently, what constitutes serious disfigurement is almost always a question for the jury." *Williams v. State*, 248 Ga. App. 316, 318 (1) (546 SE2d 74) (2001).

> In all interpretations of statutes, the courts shall look diligently for the intention of the General Assembly. In so doing, the ordinary signification shall be applied to all words. Where the language of a statue is plain and susceptible to only one natural and reasonable

6

construction, courts must construe the statute accordingly. In fact, where the language of a statute is plain and unambiguous, judicial construction is not only unnecessary but forbidden.

(Citation omitted.) *Jackson v. State*, 309 Ga. App. 24, 26 (1) (a) (709 SE2d 44) (2011). Additionally, "criminal statutes must be read according to the natural and obvious import of their language, and their operation should not be limited or extended by application of subtle and forced interpretations." (Citation and punctuation omitted.) *Bradford v. State*, 287 Ga. App. 50, 53 (1) (651 SE2d 356) (2007). When a term is not defined by statute, we look to the ordinary meaning of that word, so long as it is not a word of art or a word connected with a particular trade or subject matter. See OCGA § 1-3-1 (b) (2012) ("In all interpretations of statutes, the ordinary signification shall be applied to all words, except words of art or words connected with a particular trade or subject matter . . . .").

The statute at issue, OCGA § 16-5-24 (a), provides that

A person commits the offense of aggravated battery when he or she maliciously causes bodily harm to another by depriving him or her of a member of his or her body, by rendering a member of his or her body useless, or by seriously disfiguring his or her body or a member thereof.

The term "seriously disfiguring" is not defined in the statute, thus we look to the ordinary meaning of the word. In an attempt to define disfigurement to support an aggravated battery conviction, this Court has previously relied on Black's Law Dictionary[5] which defines disfigurement as "[a]n impairment or injury to the appearance of a person or thing," and also defines impairment as "a condition in which a part of a person's mind or body is damaged or does not work well . . . ." Black's Law Dictionary (10th ed. 2014) (emphasis supplied). Webster's Dictionary defines "appearance" as an "outward aspect" or "a sense impression or aspect of a thing . . . ." Webster's Third New International Dictionary at 103 (1981).

In light of these definitions and pursuant to OCGA § 16-5-24 (a), Weaver's argument that the infant's injuries were not "visible" is unavailing. "Serious disfigurement" may be proven where serious damage or injury occurred to a person's body or a part of a person's body, which affected the appearance of the body or body part. Although Weaver relies upon *Bray v. State*, 330 Ga. App. 768 (768 SE2d 285) (2008), *Feagin v. State*, 317 Ga. App. 543 (731 SE2d 778) (2012), *Silvers v. State*, 245 Ga. App. 486 (538 SE2d 135) (2000), and *Pollard v. State*, 230 Ga. App. 159 (495 SE2d 629) (1998) in support of her argument, none of these decisions aid

---

[5] See e.g., *Williams v. State*, 248 Ga. App. 316, 318 (1) (546 SE2d 74) (2001).

8

Weaver's claim. These decisions merely reflect the types of evidence this Court deemed sufficient to support aggravated battery convictions in those cases. Weaver has not cited any case by this Court or our Supreme Court that held that, to constitute serious disfigurement, the victim's injuries must be actually visible from the outside of a person's body. Nor has this Court precluded the holding that serious internal injuries, which can be visible through such means as x-ray, cannot support a conviction for aggravated battery. Notably, in *Byrd v. State*, 251 Ga. App. 83, 84 (1) (553 SE2d 380) (2001), this Court stated that "damage to internal organs of the victim . . . could constitute serious disfigurement." Id. at 84 (1). Although Weaver distinguishes *Byrd* by arguing that the victim in that case suffered some visible injuries, *Byrd*'s reasoning and holding were not premised on the outward visibility of the victim's injury.

This Court also addressed the issue of internal injuries for purposes of an aggravated battery conviction in *Allen v. State*, 247 Ga. App. 10 (543 SE2d 45) (2000). There, the defendant's aggravated battery by serious disfigurement conviction was based on damage to the victim's liver and spleen. Id. at 16 (4) (b). We held that the trial court did not err in failing to instruct the jury on the lesser offense of battery because the damage to the victim's liver and spleen constituted serious disfigurement

to support the defendant's aggravated battery conviction. Id. Although the issue in *Allen* was whether the trial court erred by failing to charge the jury on the lesser offense of battery, the reasoning of *Allen* applies equally here — serious injuries and documented medical damage to internal organs can be sufficient to show serious disfigurement under OCGA § 16-5-24 (a). In fact, as it directly relates to the injuries suffered by the infant in this case, this Court has long held that "[w]hether fractured bones constitute serious disfigurement will depend on the specific facts of the case." (Citation omitted.) *Harris v. State*, 272 Ga. App. 366, 369 (2) (612 SE2d 557) (2005).

Here, the State presented evidence from a child abuse pediatrician who testified that, upon reviewing the infant's x-rays and CT scans, he saw 16 fractures in the infant's ribs, legs, and pelvis. He testified that, based on the level of trauma to the infant's body, at least two different traumatic events occurred. As to the rib fractures, he testified that those fractures were most likely caused by a "squeezing force about the chest." He also testified that the leg fractures were likely caused by a yanking, jerking, or flailing motion that the infant could not have caused himself. Additionally, there was testimony that, to cause the pelvic fractures, direct trauma to the pelvis would have had to occur, such as punching or stomping the infant or by a heavy fall directly onto the infant's pelvis. While the State did not introduce the x-rays or other

photographic evidence to demonstrate how badly the bones were damaged, the doctor testified as to what he saw, and he indicated on a diagram as to how and where the bones were fractured. Again, "whether disfigurement is serious is best resolved by the factfinder on a case-by-case basis. Consequently, what constitutes serious disfigurement is almost always a question for the jury." *Williams*, supra, 248 Ga. App. at 318 (1). Thus, we conclude that this evidence was sufficient for a reasonable jury to find that there was serious "impairment or injury to the appearance of" the infant's bones, which are "members" of the infant's body. See OCGA § 16-5-24 (a). Therefore, the State met its burden of establishing serious disfigurement to support Weaver's aggravated battery convictions, and Weaver's insufficiency of the evidence claim fails.

2. Weaver contends that the evidence presented at trial that she harmed her infant son was wholly circumstantial, based solely on her custody of the child, and that it merely created a suspicion that she committed the charged crimes. She points out that both her mother and her boyfriend babysat on occasion. We disagree.

"To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6.

11

Not every hypothesis is reasonable, and the evidence does not have to exclude every conceivable inference or hypothesis; it need rule out only those that are reasonable. The reasonableness of an alternative hypothesis raised by a defendant is a question principally for the jury, and when the jury is authorized to find that the evidence, though circumstantial, is sufficient to exclude every reasonable hypothesis save that of the accused's guilt, this Court will not disturb that finding unless it is insupportable as a matter of law.

*Debelbot v. State*, 305 Ga. 534, 538 (1) (826 SE2d 129) (2019); see also *Thompson v. State*, 349 Ga. App. 1, 3 (1) (825 SE2d 413) (2019) (jury authorized to reject an alternative hypothesis it considers implausible).

The expert testified that the injuries suffered by Weaver's baby were caused by some type of trauma to the body and that they were most consistent with at least two different instances of child physical abuse. At trial, Weaver offered no alternative hypothesis for the injuries, instead stating that she had no idea how her baby was injured, or, alternatively, that nothing had happened to him and that the doctors may have made a mistake. Under the circumstances, "the jury was free not only to reject [Weaver]'s explanations of the child's injuries as unreasonable, but to find that the State's case – including testimony as to the extent and cause of the child's injuries and as to [Weaver]'s access to [him] – excluded every reasonable possibility save

12

[Weaver]'s guilt." *Hunnicutt v. State*, 276 Ga. App. 547, 549 (1) (623 SE2d 714) (2005); see *Thompson v. State*, 262 Ga. App. 17, 18-19 (1) (585 SE2d 125) (2003) (evidence, although circumstantial, was sufficient to sustain the convictions for cruelty to children where doctor testified that fractures to child's arms and ankle were not accidental and parents could not explain how child received injuries nor name anyone who might have caused them).

To the extent that Weaver now offers the alternative hypothesis that her mother could have injured her baby, the jury was entitled to reject that hypothesis as unreasonable because the parties entered a stipulation that law enforcement had ruled out Weaver's mother as a suspect, and that stipulation was read to the jury. And the jury specifically considered whether Weaver's boyfriend could have injured the baby when it addressed the charges against him, finding him not guilty on all counts. Whether the State's evidence excluded every reasonable possibility save that of Weaver's guilt was particularly a question for the jury, and we cannot say that the jury's verdict is unsupportable as a matter of law. See *Hunnicutt*, 276 Ga. App. at 549 (1); *Thompson*, 262 Ga. App. at 18-19 (1).

13

3. Weaver contends that the trial court erred in failing to include the language of OCGA § 24-14-6[6] in its charge on circumstantial evidence. We disagree.

Weaver failed to object to the trial court's charge on circumstantial evidence, which precludes appellate review of this portion of the jury charge, "unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties." OCGA § 17-8-58 (b). To establish plain error,

> [f]irst, there must be an error or defect – some sort of deviation from a legal rule – that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the *discretion* to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

---

[6] As previously noted, OCGA § 24-14-6 provides that "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused."

14

(Citation and punctuation omitted; emphasis in original) *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011).

Pretermitting whether the trial court erred in failing to give a charge on circumstantial evidence that included the language of OCGA § 24-14-6, Weaver has failed to satisfy the third prong of the plain error test. "In evaluating claims of instructional error, we examine the jury charge as a whole." *Gadson v. State*, 303 Ga. 871, 875 (2) (815 SE2d 828) (2018). Viewed as a whole, the trial court's charge sufficiently informed the jury of the State's burden of excluding all other reasonable hypotheses except Weaver's guilt with respect to the crimes charged. The court gave instructions on the State's burden to prove Weaver's guilt beyond a reasonable doubt and the State's duty to prove beyond a reasonable doubt "every material allegation of the indictment and every essential element of the crimes charged." The court also advised the jury that "[f]acts and circumstances that merely place upon [Weaver] a grave suspicion of the crime charged, or that merely raise a speculation or conjecture of [Weaver's] guilt are not sufficient to authorize a conviction. . . ." The court discussed the difference between direct and circumstantial evidence, and instructed the jury that it "would be authorized to convict only if the evidence, whether direct or circumstantial or both, excludes all reasonable theories of innocence and proves

15

the guilt of the accused beyond a reasonable doubt." The instructions the trial court gave adequately advised the jury that if it believed that the circumstantial evidence supported an alternative hypothesis, it should return a verdict of not guilty, as it did with Weaver's boyfriend. See *Gadson*, 303 Ga. at 875 (2). Under the circumstances, we cannot say that if the trial court had added a jury instruction with the language of OCGA § 24-14-6, it is likely that the jury would have returned a different verdict. Weaver has therefore failed to establish plain error. See Id. at 876 (2).

4. Weaver contends that her trial counsel was ineffective for failing to move for directed verdict on the ground that the elements of aggravated battery had not been proven and failing to object to the court's jury instruction on circumstantial evidence. This enumeration of error also fails.

> To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficient performance so prejudiced the defendant that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different. If an appellant fails to meet his or her burden of proving either prong of the *Strickland*[7] test, the reviewing court does not have to examine the other prong. In reviewing the trial

---

[7] *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984).

16

court's decision, we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts. Furthermore, there is a strong presumption that the performance of counsel was within the wide range of reasonable professional lawyering, and we cannot reach a contrary conclusion unless defendant successfully rebuts the presumption by clear and convincing evidence. Judicial scrutiny of counsel's performance must be highly deferential.

(Citation omitted.) *Bearden v. State*, 316 Ga. App. 721, 725 (3) (728 SE2d 874) (2012).

(a) Weaver contends that her trial counsel was ineffective for failing to move for a directed verdict on the three counts of aggravated battery because the State's evidence was insufficient to support those charges. In light of our holding in Division 1, however, Weaver cannot show that trial counsel was ineffective for failing to move for directed verdict on the aggravated battery charges. See *Range v. State*, 289 Ga. App. 727, 731 (4) (658 SE2d 245) (2008) (holding that because the standard for denial of a motion for directed verdict is the same as the standard for sufficiency of the evidence, the defendant could not show that trial counsel was ineffective for failing to move for directed verdict because the evidence was sufficient to sustain the defendant's conviction).

17

(b) Next, Weaver contends that her trial counsel performed deficiently when he failed to object to the trial court's charge on direct and circumstantial evidence because it did not include the language of OCGA § 24-14-6. We disagree.

"When a defendant raises an ineffective assistance of counsel claim based on counsel's failure to request or object to certain jury charges, the defendant must show that the charges in question were erroneous and that, if proper charges had been given, there is a reasonable probability that the result of the trial would have been different." (Citation and punctuation omitted.) *Wilhite v. State*, 337 Ga. App. 324, 325 (1) (787 SE2d 293) (2016). "And if the defendant fails to meet h[er] burden on one prong of this two-prong test, we need not review the other prong." Id. Pretermitting whether the trial court's charge on circumstantial evidence was erroneous, Weaver cannot establish the second prong of her claim of ineffective assistance of counsel because even if the trial court had included a jury instruction with the language of OCGA § 24-14-6, as discussed in Division 3, there is not a reasonable probability that the result of the trial would have been different. See *Gadson*, 303 Ga. at 876 (2); *Wilhite*, 337 Ga. App. at 326-327 (1) (b).

Accordingly, for the reasons stated above, we affirm the trial court's denial of Weaver's motion for new trial.

*Judgment affirmed. Reese, J., concurs. Rickman, J., concurs in Divisions 2, 3 and 4 (b) and dissents as to Divisions 1 and 4 (a).*

**\*DIVISIONS 1 AND 4(A) OF THIS OPINION ARE PHYSICAL PRECEDENT ONLY. COURT OF APPEALS RULE 33.2 (a)."**

19

A19A0016. WEAVER v. THE STATE.

RICKMAN, Judge, concurring in part and dissenting in part.

I fully concur with Divisions 2, 3, and 4 (b) of the majority opinion, except for the last sentence of the opinion, and respectfully dissent as to Divisions 1 and 4 (a) because the State failed to carry its burden of proving the "seriously disfiguring" element of the offense of aggravated battery as charged in the indictment.

OCGA § 16-5-24 (a) sets forth three methods of committing aggravated battery – by "maliciously caus[ing] bodily harm to another [either] by depriving him or her of a member of his or her body, by rendering a member of his or her body useless, or by seriously disfiguring his or her body or a member thereof." The State opted to

indict Weaver under the "seriously disfiguring" method, but failed to prove that element of the crime.[1]

The aggravated battery statute does not define "serious disfigurement" and there are no well-defined guidelines for this element of aggravated battery. To define disfigurement, we have previously looked to Black's Law Dictionary. See *Williams v. State*, 248 Ga. App. 316, 318 (1) (546 SE2d 74) (2001) ("Black's Law Dictionary defines disfigurement as that which impairs or injures the appearance of a person"); see also Black's Law Dictionary (10th ed. 2014) (disfigurement defined as "[a]n impairment or injury to the appearance of a person or thing"). The term "appearance," as relevant here, is defined as "external show" or "outward aspect." See Merriam-Webster's Online Dictionary (June 2019).

As noted by the majority, "whether fractured bones constitute serious disfigurement will depend on the specific facts of the case." *Harris v. State*, 272 Ga. App. 366, 369 (2) (612 SE2d 557) (2005). In prior cases where we have held that the trier of fact was authorized to conclude that fractured bones constituted serious

---

[1] Cf. *Earwood v. State*, 326 Ga. App. 794, 797 (1) (755 SE2d 312) (2014) (evidence of fractured arm sufficient to support jury's guilty verdict as to aggravated battery charge based on maliciously causing bodily harm to another by rendering a member of his or her body useless).

2

disfigurement, at least some evidence was presented that the victim's appearance was altered in some way. See, e.g., *Bray v. State*, 330 Ga. App. 768, 772 (1) (a) (768 SE2d 285) (2015) ("evidence that the victim fractured a bone, combined with photographs showing bruising or other visible injuries in the area of the fracture, can constitute sufficient evidence of serious disfigurement"); *Feagin v. State*, 317 Ga. App. 543, 545 (1) (731 SE2d 778) (2012) (jury authorized to find serious disfigurement where evidence included photographs depicting victim's severely swollen and bruised left eye, along with testimony that victim's eye was swollen shut and her eye socket was fractured); *Yearwood v. State*, 297 Ga. App. 633, 635 (1) (678 SE2d 114) (2009) (evidence sufficient for jury to find serious disfigurement where evidence was presented of numerous visible injuries inflicted upon the child, including a bruise to the child's head in the vicinity of the skull fracture revealed by the CT scans); *Underwood v. State*, 283 Ga. App. 638, 641 (3) (642 SE2d 324) (2007), overruled on other grounds by *Willis v. State*, 304 Ga. 686, 706 (11) (a) n.3 (820 SE2d 640) (2018) (jury could reasonably find that victim's broken nose constituted serious disfigurement where victim testified that he was able to feel his nasal bones moving around and "his nose was all laid over close to his right eye," and State introduced into evidence photographs depicting injuries to the victim's nose and surgeon's

3

testimony that the procedure used to repair the nose involved re-breaking the patient's nose and replacing it in its proper position); *Hopkins v. State*, 255 Ga. App. 202, 204 (1) (564 SE2d 805) (2002) (victim showed jurors her injuries as she testified that her arm was not only broken, but also jerked out of place; based on this testimony and what they saw, jurors could have found that victim's arm was seriously disfigured before it was set back in place); *Ganas v. State*, 245 Ga. App. 645, 646 (1) (a) (537 SE2d 758) (2000) (jury could have found temporary serious disfigurement where witnesses described the broken finger on the date of the battery as in an "unusual position," as "bent back to where it was broken," and as "just hanging there"); *Silvers v. State*, 245 Ga. App. 486, 486 (1) (538 SE2d 135) (2000) (evidence was sufficient to support aggravated battery conviction where evidence showed that victim's nasal bone was shattered, resulting in permanent injury to victim's sinuses; and State introduced photographs of the victim's black eyes, bruised face, and severely swollen nose); *Christensen v. State*, 245 Ga. App. 165, 167-168 (3) (537 SE2d 446) (2000) (motion for directed verdict properly denied where evidence showed that victim's eye socket was fractured, he received multiple stitches, and his eye was severely blackened); *Pollard v. State*, 230 Ga. App. 159, 160 (1) (495 SE2d 629) (1998) (rational trier of fact could have found broken nose constituted serious disfigurement

where photographs of the victim's facial injuries were introduced in evidence, victim's treating physician described her injuries as a nasal fracture with an "extremely deviated" septum and testified victim had bruising under each of her eyelids); *In Interest of H. S.*, 199 Ga. App. 481 (405 SE2d 323) (1991) (where victim suffered a broken nose and a laceration to the scalp requiring several stitches, evidence authorized a finding that victim had incurred at the very least a temporary serious disfigurement to his head).

The majority cites to no cases in which we have held that the existence of a fracture alone is sufficient to constitute "serious disfigurement" and discounts the relevant existing authority. Instead, the majority relies heavily on *Byrd v. State*, 251 Ga. App. 83, 84 (1) (553 SE2d 380) (2001), a case in which this court concluded that a jury could find serious disfigurement even though the injury was not immediately visible where the evidence showed that the victim's husband bit off a portion of her clitoris, causing the victim to experience bleeding, scarring, abrasion, and pain to her genital area. Id. *Byrd*, however, is distinguishable because the injuries there would have been visible upon physical examination and here the only evidence presented to show serious disfigurement was testimony that the fractures existed; the expert testified that no injuries were visible upon a physical examination and that these types

5

of fractures would not typically leave any bruises or other marks on the outside of the body. And unlike the other cases relied upon by the majority, this case does not involve severe injuries to internal organs. The issue here is whether medical testimony stating that fractures existed, without more, is sufficient to prove "serious disfigurement" under the aggravated battery statute. The expert did not testify that any "disfigurement" resulted from the fractures and no other evidence was introduced depicting the baby's actual injuries or demonstrating any alteration to the baby's appearance as a result of the injuries.[2]

Because the State presented no evidence from which the jury could find any impairment or injury to the baby's appearance, the State has failed to carry its burden of proving the "seriously disfiguring" element of the offense of aggravated battery. Accordingly, we should reverse Weaver's convictions for aggravated battery. See *Williams*, 248 Ga. App. at 319 (1).

---

[2] The majority's repeated emphasis on the type of force used to cause the injuries is not relevant to our determination of whether the resulting injuries constituted "serious disfigurement."