308 Ga. 165
FINAL COPY

S19A1474. DEBELBOT v. THE STATE .
S19A1475. DEBELBOT v. THE STATE.

BLACKWELL, Justice.

Albert and Ashley Debelbot were tried by a Muscogee County jury and convicted of the murder of their infant daughter, McKenzy. Following the denial of their motions for new trial, the Debelbots appealed, asserting, among other claims of error, that the evidence was legally insufficient to sustain their convictions and that they were denied the effective assistance of counsel. In Debelbot v. State, 305 Ga. 534 (826 SE2d 129) (2019) ("Debelbot I"), we affirmed in part, concluding that the evidence was legally sufficient to sustain the convictions, although we noted that the sufficiency of the evidence was a "close question." Id. at 538 (1). We also, however, vacated in part the denial of the motions for new trial and remanded for further consideration of the claims that the Debelbots were denied the effective assistance of counsel. Id. at 544 (2). The trial

court promptly complied with our mandate, and it again rejected the claims of ineffective assistance and denied the motions for new trial. The Debelbots appeal for a second time, and we reverse.[1]

The Debelbots contend that they were denied the effective assistance of counsel in two respects.[2] First, they say, a reasonably competent lawyer would have presented — but their lawyers did not present — expert testimony to rebut the testimony of Dr. Lora Darrisaw, a medical examiner with the Georgia Bureau of Investigation, who testified that McKenzy died of blunt force trauma that could be explained only as a criminal homicide.[3] Second, their

---

[1] We reviewed the procedural history of this case at length in our earlier opinion. See Debelbot I, 305 Ga. at 534 n.1. The trial court on remand entered a second order denying the motions for new trial in May 2019. The Debelbots timely filed a notice of appeal, their appeals were docketed to the August 2019 term of this Court, and their cases were orally argued in this Court in January 2020.

[2] Ashley also argues that the State suppressed medical testimony in violation of Brady v. Maryland, 373 U. S. 83 (83 SCt 1194, 10 LE2d 215) (1963), and that the trial court erred when it charged the jury on parties to a crime and when it failed (she says) to fully charge the jury on mere presence and mere association. Because we are reversing with respect to one of the claims of ineffective assistance, we need not consider these other issues.

[3] As we noted in Debelbot I, the testimony of Dr. Darrisaw was "the *only* evidence that a crime had been committed at all." 305 Ga. at 539 (2) (emphasis in original).

lawyers should have objected, they say, during closing argument to a gross misstatement of the law by the prosecuting attorney. As we will explain below, we agree that the Debelbots were denied the effective assistance of counsel when their lawyers failed to object to this misstatement of the law,[4] and we find it unnecessary to address the failure of their lawyers to present expert testimony.

To prevail on a claim of ineffective assistance, the Debelbots must show that the performance of their lawyers was deficient and that they were prejudiced by the deficient performance. See <u>Strickland v. Washington</u>, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove that the performance of their lawyers was deficient, the Debelbots must show that their lawyers discharged their responsibilities at trial in an objectively unreasonable way, considering all the circumstances and in the light

---

[4] The State argues that Ashley should not be heard to complain in this Court about the failure of her lawyer to object during closing argument to the misstatement of law because she did not raise this claim until the remand following <u>Debelbot I</u>. But having again reviewed our opinion in <u>Debelbot I</u>, and considering the unique circumstances of this case, we are satisfied that her claim is properly presented in this appeal.

3

of prevailing professional norms. See id. at 687-688 (III) (A). See also Kimmelman v. Morrison, 477 U. S. 365, 381 (II) (C) (106 SCt 2574, 91 LE2d 305) (1986). And to prove that they were prejudiced by the performance of their lawyers, the Debelbots must show "a reasonable probability that, but for counsel[s'] unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U. S. at 694 (III) (B). See also Williams v. Taylor, 529 U. S. 362, 391 (III) (120 SCt 1495, 146 LE2d 389) (2000). Although this burden is a heavy one, see Kimmelman, 477 U. S. at 382 (II) (C), we conclude that the Debelbots have carried it.

During closing argument, the prosecuting attorney attempted to explain to the jury that proof beyond a reasonable doubt does not require proof to an absolute mathematical certainty — that is, the law does not require the State to prove the guilt of the accused with 100 percent certainty — and that the standard of proof in a criminal case is not readily susceptible of quantification. In doing so,

4

however, the prosecuting attorney set the bar far too low, going so far as to argue that something less than a preponderance of the evidence would be enough to authorize the jury to find the Debelbots guilty. More specifically, the prosecuting attorney argued:

> Reasonable doubt. The Judge will charge you on reasonable doubt. Just keep in mind, and he will charge you, reasonable doubt does not mean beyond all doubt. It does not mean to a mathematical certainty. Which means we don't have to prove that ninety percent. You don't have to be ninety percent sure. You don't have to be eighty percent sure. *You don't have to be fifty-one percent sure.* It does not mean to a mathematical certainty.
> And it does not mean beyond a shadow of a doubt. That's just something the [television] made up. It's actually beyond a reasonable doubt. And that would be a doubt to which you can attach a reason. And I submit to you there is no reasonable doubt in this case.

(Emphasis supplied.) As we explained in Debelbot I, the argument that proof beyond a reasonable doubt requires something less than proof that leaves a jury with 51 percent certainty is "obviously wrong," 305 Ga. at 543 (2), and there is no good reason that any reasonably competent lawyer would fail to object to "such an

5

egregious misstatement of the law."[5] Id. at 544 (2). The Debelbots

have shown deficient performance.

With respect to prejudice, we are convinced that the failure to

object to the mischaracterization of reasonable doubt was uniquely

harmful in this case. As we explained in Debelbot I, the case against

the Debelbots was almost entirely circumstantial, and although the

evidence was legally sufficient to sustain their convictions under the

standard of Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d

560) (1979), even the application of that relatively undemanding

---

[5] We do not mean to suggest that reasonably competent counsel would object during closing argument to *any* misstatement of the law by a prosecuting attorney. But here, the misstatement concerns a fundamental principle of law that lies at the heart of our criminal justice system, it was obviously wrong, and as we will explain below in our discussion of prejudice, it carried a unique risk of harm in the circumstances of this case. Moreover, when the prosecuting attorney misstated the law in this case, the defense lawyers had already completed their closing arguments and had no remaining opportunities to address the jury in which they might have countered the misstatement through argument. Nor did defense counsel have any reason to think that the jury instructions would correct the misstatement. See Debelbot I, 305 Ga. at 543-544 (2) (noting that jury charge did not correct the misstatement, but might instead have reinforced it). In these circumstances, with no other means for correcting an obviously wrong statement of the law with an obvious potential to prejudice their clients, any reasonably competent defense counsel would have objected.

6

standard[6] presented a "close question."[7] 305 Ga. at 538-539 (1). The evidence that McKenzy died of blunt force trauma and that her death was a criminal homicide was unrebutted. And the evidence that only two individuals — Albert and Ashley — had an opportunity to inflict such trauma was likewise unrebutted. But evidence that would have permitted the jury to specifically attribute the infliction of trauma upon McKenzy to either or both of her parents — evidence that Albert alone inflicted the trauma, evidence that Ashley alone inflicted the trauma, or evidence that Albert and

---

[6] When we consider whether the evidence is legally sufficient to sustain a conviction under Jackson, we view the evidence in the light most favorable to the verdict, draw every reasonable inference from the evidence that is favorable to the verdict, ignore any conflicts or inconsistencies in the evidence, assume that the jury reasonably believed every word of testimony favorable to the verdict and reasonably disbelieved every word unfavorable to it, and only then inquire whether any reasonable person could conclude that the State has proved the guilt of the accused beyond a reasonable doubt. See Jackson, 443 U. S. at 319; Jones v. State, 304 Ga. 594, 598 (820 SE2d 696) (2018). By comparison, "in examining whether a defendant has shown Strickland prejudice, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done." Swanson v. State, 306 Ga. 153, 163 (829 SE2d 312) (2019) (citation and punctuation omitted).

[7] The evidence presented at trial is described at length in Debelbot I. See 305 Ga. at 535-536.

Ashley both inflicted the trauma — was notably lacking.[8] Moreover, the evidence that Albert and Ashley both shared a criminal intent to harm McKenzy — such that both would be complicit in the infliction of trauma, regardless of who actually inflicted it — was underwhelming.

To be sure, there was *some* circumstantial evidence that would have permitted the jury to conclude that both Albert and Ashley were complicit in the infliction of trauma that, according to the unrebutted testimony of Dr. Darrisaw, led to the death of McKenzy. Albert and Ashley were married and lived together, they both were present in their apartment during most of the 13 hours in which the trauma must have been inflicted, and they both maintained before and at trial that neither of them had harmed McKenzy. As we noted in Debelbot I, "[w]hether a person is a party to a crime may be inferred from that person's presence, companionship, and conduct

---

[8] The only direct evidence from which the jury might have specifically attributed any infliction of trauma to either Albert or Ashley was the testimony of a convicted felon and inmate, who testified that Albert told him that Albert had left the apartment to buy drugs on the night in question and that, when Albert returned, Ashley said that she had spanked McKenzy.

before, during, and after the crime, and where the crimes involve relatives with close relationships, slight circumstances can support the inference that the parties colluded." 305 Ga. at 538 (1) (citation and punctuation omitted). Notwithstanding the relative weakness of the evidence of collusion in this case, perhaps the jury found beyond a reasonable doubt from this evidence that both Albert and Ashley were complicit in the infliction of trauma upon McKenzy. But the gross misstatement of the law by the prosecuting attorney during closing argument suggests another plausible explanation for the verdict.

Accepting the unrebutted expert testimony that McKenzy died as a result of the criminal infliction of blunt force trauma, accepting the compelling evidence that Albert and Ashley had essentially equal opportunities — and no one else had any opportunity at all — to inflict that trauma, in the absence of evidence suggesting that the trauma was inflicted specifically by one or the other, and irrespective of whether Albert and Ashley colluded, the logical probability that either of them inflicted the fatal trauma would be

9

50 percent. A 50 percent probability of guilt does not, of course, authorize a jury to find guilt beyond a reasonable doubt. See Debelbot I, 305 Ga. at 544 (Bethel, J., concurring) ("if two causes of an outcome are equally likely, neither has been proved beyond a reasonable doubt"). But the prosecuting attorney in this case told the jury that something less than a 51 percent probability of guilt[9] would be enough, shortly after telling the jury that, as between Albert and Ashley, the State did not "have to prove it was one or the other." And although the trial court gave an instruction on reasonable doubt that would be sufficient in most cases to adequately advise the jury of the burden of proof,[10] the charge "did not cure the State's obviously wrong argument here," id. at 543 (2),

---

[9] Although our opinion focuses on the prosecuting attorney's misstatement that proof beyond a reasonable doubt does not require evidence establishing even a 51 percent certainty of guilt, we also disapprove the statements that a jury need not be 90 percent or 80 percent certain of guilt to find beyond a reasonable doubt that a defendant is guilty. We admonish lawyers not to confuse jurors by attempting to quantify a standard of proof that is not susceptible of quantification.

[10] The text of the jury charge can be found in Debelbot I. See 305 Ga. at 536-537.

10

and to the contrary, "may well have been understood by the jury . . . as reinforcing it." Id. at 544 (2). The Debelbots have shown a reasonable probability that, but for the failure of their lawyers to object during closing argument to the gross misstatement of the law by the prosecuting attorney, the outcome of their trial would have been different.[11]

Because the Debelbots were denied the effective assistance of counsel at trial, their convictions are reversed.

Judgments reversed. All the Justices concur.

---

[11] Although we need not reach any of the issues that were briefed with respect to the medical expert testimony and claims of ineffective assistance on those grounds, nothing in our opinion should be taken as an endorsement of the trial court's rulings on those matters. In fact, members of this Court harbor serious reservations about the correctness of those rulings. Nevertheless, we need not address them in this opinion, as they appear unlikely to be presented again in precisely the same way in the event of a new trial.

DECIDED FEBRUARY 28, 2020.

Murder. Muscogee Superior Court. Before Judge Smith.

*Thomas M. Flournoy III; Carrie Sperling*, for appellant (case no. S19A1474).

*James C. Bonner, Jr., Jimmonique R. S. Rodgers; Brandon A. Bullard; Robins Kaplan, A. James Anderson; Eversheds Sutherland (US), Anna C. Halsey*, for appellant (case no. S19A1475).

*Julia F. Slater, District Attorney, Alonza Whitaker, Sadhana P. Dailey, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General*, for appellee.