**FIRST DIVISION**
**BARNES, P. J.,**
**BROWN and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**August 25, 2022**

# In the Court of Appeals of Georgia

A22A0991. HUGHES v. THE STATE.

BROWN, Judge.

A jury found George Hughes guilty of six counts of aggravated assault, three counts of aggravated battery, four counts of possession of a firearm during the commission of a crime, conspiracy to commit armed robbery, and attempt to commit armed robbery. On appeal, Hughes asserts that trial counsel provided ineffective assistance of counsel in two respects: (1) failing to conduct a limited examination of a forensic psychologist in order to preclude the State from rebutting lay testimony with an expert witness; and (2) failing to object when the forensic psychologist expressed a legal opinion on Hughes' insanity defense. For the reasons explained below, we affirm.

The test for determining whether an appellant received ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984). Under *Strickland*, to establish a constitutional deprivation of the right to counsel, appellant has the burden of showing that counsel's performance was deficient and that the deficient performance prejudiced the defense by creating a reasonable probability that but for counsel's errors, the outcome of the trial would have been different. Failure to satisfy either prong of this two-part test is fatal to an ineffective assistance claim.

(Citations and punctuation omitted.) *Wallin v. State*, 285 Ga. App. 377, 381 (646 SE2d 484) (2007). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Citations and punctuation omitted.) *Debelbot v. State*, 308 Ga. 165, 167 (839 SE2d 513) (2020). "[I]n examining whether a defendant has shown *Strickland* prejudice, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done." (Citation and punctuation omitted.) Id. at 168, n.6.

Here, the State presented evidence showing that, around 10:30 p.m. on December 26, 2005, an off-duty uniformed police officer working security for a large retail store saw Hughes and another person walk into the store. Hughes "either tripped or staggered" as he walked past the officer and "had on a dark pair of sunglasses" that

2

he took off after walking into the store. Hughes was "mumbling something" to the person who walked in with him. The officer, suspecting that Hughes might be intoxicated, watched him and his companion go to another part of the store before Hughes returned to the front, mumbled something, staggered or tripped again, put on his sunglasses, and walked into the parking lot. The officer followed Hughes outside and asked him to stop because he was concerned that he might be intoxicated. When Hughes did not respond, the officer asked him to stop a second time, at which point Hughes stopped, looked over his shoulder, and saw the uniformed officer. The officer was approximately eight to twelve feet away from Hughes and saw him make a motion with his arms and elbows that the officer assumed was Hughes taking off his sunglasses. When the officer asked Hughes to turn around because he needed to speak to him, Hughes turned to his right, pointed a semi-automatic weapon at the officer, and fired. The weapon had an extended clip that allowed it to carry two to three times as many rounds as it would normally carry. The officer turned and ran while Hughes continued firing at him. Once he reached cover, he drew his weapon, returned fire, and radioed for help. After other officers arrived, one of them asked Hughes to drop his weapon; when Hughes turned toward the officer and pointed his gun at him, the

3

officer shot Hughes and incapacitated him. After being transported to the hospital, Hughes "stated he had no recollection of the shooting."

During the incident, Hughes shot the officer working security, as well as a store employee. The officer described Hughes as "seem[ing] not to be as worried about getting shot as I was because he would just stand up and start firing. . . ." The officer did not observe any attempt by Hughes to commit a robbery while inside the store.

Following the shooting, the police gathered witnesses and transported them to the police station for interviews. Following a review of the store's surveillance video, the police identified Clyde Perchelli as the person who had entered the store with Hughes. In an interview with a GBI agent, Perchelli admitted that he rode with Hughes to the store and that they planned to rob it, with Perchelli acting as a lookout. After they entered the store, Hughes went outside to get a weapon and extra magazine for Perchelli because they saw a police officer in the store. At one point in the interview, Perchelli told the agent that Hughes "was talking about robbing and I didn't really take it to the full extent. I thought that maybe it was the pills talking, cause he ate maybe. . . ."[1] According to Perchelli, Hughes "gets crazy when he eats

_____

[1] Perchelli was interrupted and he never explained what or how many pills Hughes has consumed.

4

pills." Following Perchelli's arrest, the police found "two throwing knives" on his person.

Two weeks before Hughes' trial, Perchelli pleaded guilty to three counts of aggravated assault, aggravated battery, and conspiracy to commit armed robbery for his involvement in the events at the store. He testified that he and Hughes had been drinking alcohol all day and denied any plan to rob the store, claiming that they went to the store to meet Perchelli's girlfriend. He stated that he was at the service desk to ask that his girlfriend be called to the front when Hughes went outside and started shooting.

Hughes testified at trial and presented three lay witnesses to support his defense of not guilty by reason of insanity. At the time of the incident, Hughes was 44 years old and living with his parents following a separation from his wife of 21 years. He testified that he did not know Perchelli and that his only memory of the incident was waking up in jail and being told about it. He testified that he was on disability beginning in 1993 or 1994 and that his medications included morphine for chronic pain, as well as medications for "anxiety and panic disorder" and seizures. He explained that without a leg brace, his "knee will buckle and pop out the wrong direction" and this can cause him to stagger and sometimes fall down. He testified

5

that he had memory problems before the incident causing him to "forget little things, big things, people always reminding me of stuff, like ball games, outings with the family and stuff like that." He denied a history of illegal drug use.

Hughes' mother testified that he began exhibiting "strange behavior" in junior high school, resulting in him being hospitalized on six different occasions. She explained that they initially "thought he was on drugs[,]" but the blood work showed that he was not and she was not aware of any use of illegal drugs by Hughes. She stated that Hughes "would get mad and fly into a rage for no reason at all. And he would always tear something up," such as his room or a mailbox. She explained that "he didn't get along with people, he didn't like anybody" and would "get mad at the cat, the dog, people, neighbors." She testified that Hughes suffered from periods of depression and attempted to die by suicide on multiple occasions, including shooting himself in the chest and barely missing his heart.

On one occasion Hughes took his mother's car, was chased by police while speeding, and could not remember where he had been when he arrived home. After this incident, they took him to a psychiatric hospital because "he had this unusual look in his eyes and he seemed angry and he couldn't be still." She testified that he stayed there five days and "nothing was done . . . and it didn't help him." She

described another incident where he disappeared for several days in his car and when he was brought home by another person, he could not remember what had happened to his car, which was never recovered.

Hughes' 21-year-old daughter testified that she was aware that he had seen a psychiatrist for most of his life and was on several medications for bipolar disorder. She had no knowledge of him using illegal drugs. He also suffered a severe head injury in a car accident that caused seizures for which he took medication. She explained that he has memory problems and does not remember her wedding or walking down the aisle with her. She stated that "when [her father got] angry[,] . . . it seemed like he would just black out and he didn't know what he was doing, he didn't think about what he was doing, he just did." On one occasion he got into an argument with another daughter, who was pregnant, and "smacked her." She testified that "normal people don't hit pregnant girls . . . but when daddy got angry he didn't see that and he didn't think about it. And after . . . , he felt so bad that he actually left and moved out . . . [and] went to live with his mom."

The testimony of Hughes' 20-year-old daughter was largely cumulative of the testimony of her grandmother and sister with regard to his history of seizures, suicide attempts, memory issues, and lack of illegal drug use. Like them, she described

7

Hughes as "fine and somebody could say something and a twist of personality would come out and he would be screaming and then the next minute he would be fine."

After the State and Hughes rested their cases, the trial court announced that it was calling a witness to testify, Dr. Sam Perri. Hughes' counsel then stated: "Now, as the Court said the Court is technically calling you so we're not used to handling that, so I will kind of lead your examination and [counsel for the State] will have his opportunity to talk with you." After asking questions establishing that Dr. Perri was the Director of Forensic Services at Northwest Georgia Regional Hospital, had been conducting forensic exams for over 25 years, and held a master's degree in developmental psychology and a PhD in clinical psychology, counsel asked an open-ended question about Dr. Perri's evaluation of Hughes.

Dr. Perri testified that pursuant to a court order, he examined Hughes to provide an opinion as to his competency to stand trial, as well as his mental condition at the time of the offense. He spent approximately 45 minutes with Hughes on February 7, 2007, and a shorter period of time with him on March 16, 2007.

On both occasions, Hughes "was oriented, he knew where he was, he would tell me his name, he knew what month it was, the year. He did report when asked about being anxious or nervous he stated, quote, all the time. . . . When asked if he

8

felt depressed he stated pretty much. And he appeared to be at least mildly depressed." When Dr. Perri asked Hughes if he had "suicidal ideas or plans," Hughes answered "none ever." Dr. Perri did not observe "any major problems in [his] mental status exam." Hughes "was articulate. He was able to organize his thoughts, when I asked him a question he was able to think about it. He was able to process the question and give me a rational and logical response to the question." Hughes did not have any false perceptions (visual or auditory hallucinations) or delusions (false beliefs). In Dr. Perri's opinion, nothing in the investigative reports or his interview with Hughes supported the conclusion that Hughes was delusional or psychotic. Hughes "memory seemed to be intact to most events, but he reported that he has blackouts. He also reported that he was amnesic for the events that led to his present legal situation." Dr. Perri did not "find any evidence to support the notion that he was not telling me the truth in saying he does not remember."

With regard to Hughes' mental condition at the time of the incident, Dr. Perri testified that this is "an extremely difficult question" made "more difficult" by Hughes' lack of memory. He explained,

> if a person can't tell me what was going on at the time of the alleged
> offense, . . . it's extremely difficult for me to come up with a conclusion

9

if the person was insane. . . . I'm conservative when it comes to rendering opinions of insanity, but that doesn't mean that I'm not objective and fair, but I need evidence. . . . I need fairly good evidence to support a plea of insanity and I didn't have nothing even close to that in this case.

While Dr. Perri acknowledged that Hughes had a history of mental health hospitalizations and being treated with medications for mood disorder, anxiety, and depression, "there was nothing to reach in my opinion the level of what the State of Georgia requires to find a person not responsible or what we call NGOI, not guilty by reason of insanity. I could not find any evidence to support that."

Dr. Perri acknowledged that he did not perform any tests on Hughes, such as the Minnesota Multiphasic Personality Test, because "there's no psychological test that I could give to any person in this room and determine what their mental state was five months ago, maybe even two months ago." In his view, he was not in court "to give a whole psychological profile of the person[,]" but if he had to take "just a wild guess . . . , it's probably a good possibility of having bipolar disorder." One of the medications prescribed to Hughes is "usually used as a mood stabilizer" and "suggested" bipolar disorder to Dr. Perri. He also expressed "no doubt that Mr.

Hughes does have a mental illness[,]" particularly in light of receiving full disability for "mental disorders" since 1993.

While Dr. Perri explained that a panic attack will cause a person to have a high heart rate with sweating and shaking, he provided no testimony about the symptoms of bipolar disorder or whether it could impact a person's mental capacity to distinguish between right and wrong. He admitted that he never talked with Hughes' mother, but explained that "there's nothing that would have been said that could have changed my opinion about his degree of criminal responsibility at the time."

Dr. Perri described Hughes as a very reliable historian of his mental illnesses, even though Hughes denied any previous suicide attempts and he did not relate any anger management issues to Dr. Perri. He later admitted that if Hughes had attempted suicide on numerous occasions, it would indicate that he was not a very good historian and "there's more abnormality . . . than he led [Dr. Perri] to believe." In a follow-up question from the State, Dr. Perri agreed that it was "possible" that Hughes was making up memory loss about a specific event if he testified at trial that he previously had attempted suicide. Dr. Perri also agreed "that pre-planning of a crime [and getting someone to act as a lookout] mitigates strongly against any type of inability to distinguish between right and wrong."

11

1. We find no merit in Hughes' first claim of ineffective assistance as it is based upon a misapprehension of the relevant law. Relying primarily upon *Nance v. State*, 272 Ga. 217, 219 (2) (526 SE2d 560) (2000), Hughes contends that because he submitted only lay witnesses to factually support his insanity defense, the State could not rebut this evidence with the testimony of Dr. Perri. He contends that trial counsel lost this procedural limitation by examining Dr. Perri and inviting him to give harmful opinion evidence that was detrimental to his defense.

Hughes' argument is flawed because the expert was called as a witness by the trial court, not the State, pursuant to the procedure outlined in OCGA § 17-7-130.1, which provides:

> At the trial of a criminal case in which the defendant intends to interpose the defense of insanity, evidence may be introduced to prove the defendant's sanity or insanity at the time at which he is alleged to have committed the offense charged in the indictment or information. When notice of an insanity defense is filed, the court shall appoint at least one psychiatrist or licensed psychologist to examine the defendant and to testify at the trial. This testimony shall follow the presentation of the evidence for the prosecution and for the defense, including testimony of any medical experts employed by the state or by the defense. The medical witnesses appointed by the court may be cross-examined by both the prosecution and the defense, and each side may introduce evidence in rebuttal to the testimony of such a medical witness.

12

Id. As the Supreme Court of Georgia explained in *Danenberg v. State*, 291 Ga. 439 (729 SE2d 315) (2012), when the trial court appoints an expert pursuant to OCGA § 17-7-130.1, the expert should not be considered an expert of the State, even if the expert's opinion supports the position of the State. Id. at 445-446 (8). See also *Tolbert v. State*, 260 Ga. 527, 528 (2) (b) (397 SE2d 439) (1990). "The court-appointed . . . expert is an independent and impartial witness who cannot be classified as an agent of the [S]tate." (Citation and punctuation omitted.) *Danenberg*, 291 Ga. at 445 (8). In *Danenberg*, as in this case, the defendant gave notice of an insanity defense and the trial court issued an order directing the Department of Human Resources to conduct an evaluation of the defendant. Id. And, as outlined in OCGA § 17-7-130.1, the expert witness was called by the trial court as a witness after the State and Hughes presented their evidence.

Hughes' reliance upon *Nance*, 272 Ga. at 218-220 (2), and *Abernathy v. State*, 265 Ga. 754 (1) (462 SE2d 615) (1995), is misplaced. In these cases, the Supreme Court addressed the scenario where a defendant is required to submit to an examination by the State's expert witness. They have no application to an expert appointed by the trial court under OCGA § 17-7-130.1.

13

2. In his remaining claim of ineffective assistance, Hughes contends that his trial counsel should have objected when Dr. Perri testified on two separate instances that his examinations did not support a finding of "not guilty by reason of insanity." He argues that "Dr. Perri's impermissible expert opinion went to the central issue the jury was to decide and its admission cannot be deemed harmless." In his view, but for trial counsel's failure to object to this testimony, he would have been found not guilty by reason of insanity in light of the "compelling evidence that he had severe mental health issues."

Even if we assume, without deciding, that trial counsel should have objected to Dr. Perri rendering an opinion on an alleged ultimate legal issue, Hughes cannot demonstrate prejudice under the second prong of the *Strickland* standard for ineffective assistance of counsel. An examination of the law concerning an insanity defense demonstrates the weakness of Hughes' claim of insanity in this case.

"A defendant is presumed to be sane," *Hudson v. State*, 308 Ga. 443, 447 (2) (b) (841 SE2d 696) (2020), and "has the burden to prove by a preponderance of the evidence that he was insane at the time the crime was committed." (Citation and punctuation omitted.) *McElrath v. State*, 308 Ga. 104, 106 (1) (b) (839 SE2d 573) (2020). OCGA § 16-3-2 provides: "A person shall not be found guilty of a crime if,

14

at the time of the act, omission, or negligence constituting the crime, the person did not have mental capacity to distinguish between right and wrong in relation to such act, omission, or negligence." Under OCGA § 16-3-3, "[a] person shall not be found guilty of a crime when, at the time of the act, omission, or negligence constituting the crime, the person, because of mental disease, injury, or congenital deficiency, acted as he did because of a delusional compulsion as to such act which overmastered his will to resist committing the crime." "[A] defendant who can distinguish between right and wrong and who commits a criminal act he recognizes is *wrong* but which he is compelled to commit by an uncontrollable impulse or compulsion has no insanity defense under Georgia law." (Punctuation omitted; emphasis in original.) *Lawrence v. State*, 265 Ga. 310, 313 (2) (454 SE2d 446) (1995).

As the Supreme Court of Georgia has explained, mental illness or abnormality, such as bipolar disorder, is not the equivalent of legal insanity. *Durrence v. State*, 287 Ga. 213, 215 (a) (695 SE2d 227) (2010). Evidence that a defendant does not remember committing a crime or "was in a blanked out state of mind during the commission of the acts charged" does not authorize a jury instruction on an insanity defense. (Citation and puntuation omitted.) *Crossley v. State*, 261 Ga. App. 250, 252 (582 SE2d 204) (2003). See also *Reeves v. State*, 234 Ga. 896, 898 (3) (218 SE2d

15

625) (1975), overruled on other grounds, *Jackson v. State*, 239 Ga. 40 (1) (235 SE2d 477) (1977); *Garrett v. State*, 126 Ga. App. 83, 84 (2) (189 SE2d 860) (1972). Additionally, an inability to distinguish between right and wrong is not a defense to a crime if the inability is a consequence of voluntary intoxication. *Payne v. State*, 273 Ga. 317, 318-319 (4) (540 SE2d 191) (2001).

In this case, the trial court appropriately instructed the jury on the law regarding an insanity defense, that it was not required to accept the testimony of an expert witness, and that it should not place any significance on the fact that Dr. Perri was called as a witness by the trial court. The State presented evidence showing that Hughes had consumed alcohol all day before the offense, had formulated a plan to rob the store, was stumbling and mumbling in the store before the shooting began, and that the officer confronted him in the parking lot because he thought he was intoxicated. The lay witness testimony offered in support of Hughes' insanity defense showed that he had a mental illness, memory issues, and would lose control when he became angry, but provided no evidence as to whether he had the mental capacity to distinguish between right and wrong at the time of the offenses or was suffering from a delusional compulsion. See *McBride v. State*, 314 Ga. App. 725, 728-729 (1) (725 SE2d 844) (2012). Having reviewed the evidence de novo as we expect reasonable

16

jurors to have done, we cannot say that a reasonable probability exists for a different outcome had trial counsel objected to the legal conclusions of Dr. Perri.

*Judgment affirmed. Barnes, P. J., and Hodges, J., concur.*