NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: August 26, 2025

S25A0883. PAYNE v. THE STATE.

PETERSON, Chief Justice.

Antonio Payne appeals his convictions for the murder of Warren Sills and aggravated assault of Dondrey Moore. The convictions stem from Payne shooting at the men in an apartment complex parking lot.[1] Payne argues that (1) the trial court erred by

---

[1] The crimes took place on April 6, 2019. On June 25, 2019, a DeKalb County grand jury returned an indictment charging Payne with malice murder (Count 1), felony murder predicated on both aggravated assault (Count 2) and possession of a firearm by a convicted felon (Count 3), aggravated assault of Sills (Count 4) and Moore (Count 7), possession of a firearm by a convicted felon (Count 5), and two counts of the use of a firearm by a convicted felon during the commission of a crime (Counts 6 and 8). The trial was bifurcated to exclude the firearm counts and the felony murder count predicated on possession of a firearm (Counts 3, 5, 6, and 8). At an October 2022 jury trial, the jury returned guilty verdicts on all counts before it — malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), and aggravated assault of Sills (Count 4) and Moore (Count 7). The bifurcated counts were nolle prossed. On December 9, 2022, the trial court sentenced Payne to life in prison without the possibility of parole for murder (Count 1), plus 20 years concurrent in prison for the aggravated assault of Moore (Count 7). The other aggravated assault count (Count 4) merged, and the felony

admitting an out-of-court identification of him by a witness; and (2) his trial counsel was ineffective for failing to object to the prosecutor's explanation of reasonable doubt in closing argument. We conclude that (1) the trial court did not err in admitting the out-of-court identification; and (2) Payne has not shown that counsel's deficient performance in failing to object to the State's closing argument prejudiced his case. We affirm.

The evidence at trial showed the following.[2] In April 2019, Payne was living in a DeKalb County apartment with his brother, Quentin Rozier. On the night of April 6, 2019, Sills and Moore arrived at Payne and Rozier's apartment complex in Sills's Infiniti

murder count on which Payne was found guilty (Count 2) was vacated by operation of law. Payne filed a timely motion for new trial, which was amended in July 2024.  Following a hearing, the trial court denied the motion in an order entered on August 30, 2024. In that order, the trial court amended Payne's sentence to provide that Payne was sentenced as a recidivist pursuant to OCGA § 17-10-7(b)(2), although it does not appear that an amended sentence is contained in the record. Payne filed a timely notice of appeal, which he later amended. The appeal was docketed to this Court's April 2025 term of court and submitted for consideration on the briefs.

[2] Because Payne does not raise a claim that the evidence to support his convictions was insufficient as a matter of constitutional due process, and because one of the enumerations he does raise requires us to consider the strength of the evidence, we lay out the evidence as a reasonable juror would view it, rather than in the light most favorable to the verdicts.

convertible, with the top down. Shortly after Sills parked his car in front of Rozier and Payne's building, a man came down the stairs of the building, approached the driver side of Sills's car, and complained about them playing music loudly. The three exchanged words further, and then the man pulled a gun from his pocket and started shooting. The shooter walked around the front of the car and then fired more shots.

Realizing he had been shot, Moore got out of the car and summoned help. Police responded around 10:00 p.m. and found Sills dead in the driver's seat of the convertible. Rozier, who had long dreadlocks and matched a 911 caller's description of someone the caller said she believed was the shooter, spoke to police when they arrived and was taken into custody. Rozier initially was charged with felony murder in connection with the shootings, but the case against him was not presented to the grand jury.

The medical examiner testified that Sills died of a gunshot wound to the head. The medical examiner collected fragments of a bullet from Sills's head. A GBI firearms examiner determined the

3

fragmented bullet retrieved from the autopsy was a ".38-class" jacketed hollow-point bullet that could have been fired from a .38-caliber special revolver, a .357-caliber revolver, or a 9 mm pistol — although not as likely from a 9 mm pistol, and definitely not from a .40-caliber weapon. No shell casings were recovered at the scene of the shooting, which also suggested that a revolver, rather than a semi-automatic pistol, was used to shoot Sills.

Payne was implicated as the shooter by three different eyewitnesses: Rozier, Moore, and Kristie Barlow, Payne and Rozier's cousin. Rozier testified at trial that, on the night of the shooting, he and Payne were using drugs and drinking alcohol in their apartment. Rozier said that he also had been preparing for a night out with his girlfriend, bathing his children and getting them ready to go with his cousin. Rozier testified that he was in the bathroom when he heard three or four gunshots. He said he then looked out of his apartment and saw Moore jump over Sills's car. Rozier said he grabbed his .40-caliber gun, cocked it, and went outside; Rozier referred to his gun as "an automatic." Rozier said he encountered

Payne fleeing the scene, before finding Sills dead in his car. Rozier testified that he returned to his apartment and gathered up drug contraband, disposing of it outside of the building, and put a gun in his car. According to Rozier, Payne carried a black .38-caliber revolver. In Rozier's apartment, police found food on the stove, water in the bathtub, and a single .40-caliber live round on the floor.

Interviewed by police at the hospital on the day after the shooting, Moore was shown a photo lineup that included Rozier but not Payne; Moore indicated that he did not recognize anyone in any of the photos. Investigators interviewed Moore again two months later in June 2019, presenting him with a second photo lineup; Moore selected Payne's photo as that of the shooter, writing that the identification was "100% accurate" and confirming that he was "very confident." At trial, Moore identified Payne as the shooter in the courtroom and testified that the identification was "a hundred percent accurate." Moore testified that Payne was wearing a hoodie with the hood up but Moore could see that Payne had short hair. Moore testified that he did not see anyone with Payne during the

5

shooting and did not see anyone with dreadlocks that night.

Barlow testified that she witnessed the shooting when she arrived to babysit Rozier's children. Barlow testified that after she arrived at the apartment complex, she saw Payne talking to Sills by his car, heard Payne yelling to turn the radio down, and saw Payne pull something out of his pocket and raise it; she then heard three or four gunshots. The State played a recording of a prior statement by Barlow to police, including the portion of the recording in which Barlow said that she was "[a] hundred percent sure" that Payne was the shooter and that Payne had been wearing Barlow's hoodie.

1.  Payne argues that the trial court should have excluded evidence of Moore's June 2019 out-of-court identification of him because it was impermissibly suggestive and created a substantial likelihood of misidentification in violation of his due process rights. We disagree.

Payne filed a pretrial motion to suppress Moore's out-of-court identification of Payne as the shooter, on the ground that the June 2019 photo lineup shown to Moore was "suggestive." At the hearing

on the motion, the officer who administered the photo lineup testified that he did not create the photo lineup, did not know who the suspect was, gave the photos to Moore in an envelope with instructions to remove them, and did not tell Moore that they had a suspect in custody or that the shooter was in the lineup. An audio recording of Moore's out-of-court identification admitted at the hearing is consistent with this. The trial court orally denied the motion to suppress at the hearing, saying that the photos used in the lineup "are pretty similar" and any issues with the identification could be explored on cross-examination.

"A motion to suppress an out-of-court identification by a witness as impermissibly suggestive in violation of due process ... requires a showing that the identification was so impermissibly suggestive that it could result in a substantial likelihood of misidentification." *Howard v. State*, 318 Ga. 681, 687 (2024) (quotation marks omitted). We employ a two-step process to determine whether identification evidence meets that test:

> First, we decide whether the identification procedure

used was impermissibly suggestive. Second, if a trial court properly concludes that the State employed an impermissibly suggestive pre-trial identification procedure, the issue becomes whether, considering the totality of the circumstances, there was a substantial likelihood of irreparable misidentification.

Id. (cleaned up).

Here, Payne argues that the June 2019 lineup's use of the same "mugshot" photo of him that was used in a news article that identified him as a suspect in the shooting "created a prejudicial pre-lineup exposure that rendered the procedure inherently suggestive." At the hearing on his motion to suppress, Payne's counsel referenced an April 15, 2019, article. But Payne did not introduce any evidence of the article at the hearing, and counsel acknowledged at the hearing that he could not "verify that [Moore] did, in fact, see" the article. Even putting aside Payne's failure to seek admission of evidence of the article's existence or Moore's exposure to it,[3] this

---

[3] Payne does not cite to any such evidence in the record on appeal, and it does not appear that any such evidence was admitted, either at the suppression hearing, at trial, or at the hearing on the motion for new trial. Moore testified at trial that he did not research potential suspects or search for information about the shooting online and that he never saw any booking photos other than in lineups.

claim fails. We have said that "a challenge such as this goes to the weight of the evidence, not the admissibility[,]" because it does not amount to an argument "challenging the identification procedure used by law enforcement, but, instead, is challenging the weight and credibility of [the witness's] identification." *Clay v. State*, 309 Ga. 593, 598 (2020) (rejecting challenge to witness's identification of defendant from a photo lineup after seeing news reports of defendant's arrest).

Payne also argues that the identification of him by Moore was "unreliable" because Moore did not testify specifically that he saw Payne shoot a gun, noting that Moore testified that he ducked down when he heard shots.[4] To the extent that Payne intends this to serve as a separate basis for concluding that evidence of Moore's identification should have been suppressed, arguments about

---

[4] Although Moore testified that he ducked down when he heard the gunshots, he also testified that he and Sills were parked directly underneath a street light, enabling Moore to see the shooter's face, and that the shooter was so close to the car, which had its top down, that the shooter was "literally on the door" when he started shooting. And although Moore testified that he did not see Payne holding a gun initially, he testified that he did see the gun when Payne came around the front of the car before continuing to shoot.

whether a witness had sufficient opportunity to observe the suspect go to whether there is a substantial likelihood of irreparable misidentification, not whether the identification procedure was impermissibly suggestive. See, e.g., *Mitchell v. State*, 320 Ga. 673, 682 (2025) (circumstances determining whether there was a substantial likelihood of irreparable misidentification "include the witness's opportunity to view the perpetrator at the time of the crime, his degree of attention, the accuracy of his prior description, his level of certainty, and the length of time between the crime and identification"). And where, as here, the defendant has not shown that the identification procedure was impermissibly suggestive, we do not consider whether there is a substantial likelihood of misidentification. See *Howard*, 318 Ga. at 687.[5]

2.     Payne's only other argument is that trial counsel was

_____

[5] In his motion to suppress, Payne argued that the June 2019 photo lineup shown to Moore was "suggestive" because the background of the photo of Payne in the lineup was different from the background of the other photos in the lineup. At the hearing on the motion, the State pointed out that two of the photos in the lineup, that of Payne and another person, have a different background from that of the others. At any rate, on appeal, Payne does not point to differences in the backgrounds of the photos as a basis for reversal of his convictions.

constitutionally ineffective for failing to object to a mischaracterization of the State's burden of proof during the prosecutor's closing argument. We conclude that Payne has not shown any prejudice from counsel's deficient performance in this regard.

During the State's closing argument at trial, the prosecutor argued the following regarding the State's burden of proof:

> [W]e have to prove this case beyond a reasonable doubt. And that's our burden. We accept it. We accept it happily. But proving a case beyond a reasonable doubt is not something that's insurmountable. Judge Scott is going to instruct you in a few moments that reasonable doubt is the doubt of a fair-minded, impartial juror honestly seeking the truth. He's also going to explain to you that reasonable doubt is based on common sense and reason. And, as I told you at the beginning of this trial, the reason each and every one of you is sitting on this jury is because you impressed upon us when we spoke to you at the beginning of the trial that you are the kind of people who use common sense when making decisions, and that is what I am asking you to do during the course of your deliberations today. Now, reasonable doubt is not — and Judge Scott's going to read this to you as well. It's not to a mathematical certainty. We don't have to prove a case to 50 percent or 70 percent or 100 percent to you. And it's not beyond all doubt. The law anticipates that there's going to be doubt in a case.

Trial counsel did not object during this portion of the State's

11

argument. In its preliminary charge to the jury, the trial court instructed the jury that what lawyers say in opening statements and closing arguments is not evidence. In its final jury charge, the trial court instructed the jury that the State was not required to prove the accused's guilt to a mathematical certainty. It also instructed the jury on the burden of proof, presumption of innocence, and reasonable doubt, and reiterated that closing arguments and opening statements by the attorneys are not evidence.

To prove his claim of ineffective assistance of counsel, Payne must show that counsel's performance was deficient and that counsel's deficient performance prejudiced Payne's defense. See *Strickland v. Washington*, 466 US 668, 687 (1984). "If a defendant fails to establish one of these two prongs, we need not examine the other." *Troutman v. State*, 320 Ga. 489, 494 (2024) (cleaned up). "To show deficient performance, the defendant must demonstrate that counsel performed counsel's duties in an objectively unreasonable way, considering all of the circumstances and in the light of prevailing professional norms." Id. (quotation marks omitted). "To

12

establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." Id. (cleaned up). "In reviewing a ruling on a claim of ineffective assistance of counsel, we defer to the trial court's findings of fact unless they are clearly erroneous, but we apply the law to the facts de novo." Id. (quotation marks omitted).

A prosecutor's closing argument that mischaracterizes the burden of proof by suggesting "that proof beyond a reasonable doubt requires something less than proof that leaves a jury with 51 percent certainty is obviously wrong." *Debelbot v. State*, 308 Ga. 165, 167 (2020) (*Debelbot II*) (quotation marks omitted). The prosecutor's statement to the jury that under the reasonable doubt standard the State did not "have to prove a case to 50 percent" — i.e., less than the far lower standard of preponderance — thus was "plainly improper." *Troutman*, 320 Ga. at 499. And "[w]e cannot conceive of any good reason that a competent criminal defense attorney could have to fail to object to such an egregious misstatement of the law."

*Debelbot v. State*, 305 Ga. 534, 544 (2019) (*Debelbot I*).

But Payne has not shown prejudice from this deficient performance. He argues that the prosecutor's argument in this case was harmful in the same way that it was harmful in *Debelbot*, because in both cases two people had "equal opportunity" to commit the crime. That is not a fair comparison. In *Debelbot*, the case against the defendants — the infant victim's parents — was "entirely circumstantial," in that it established that the victim's injuries were caused by blunt force trauma that must have occurred over the course of 13 hours during which the baby was in the sole care of the defendants. See *Debelbot I*, 305 Ga. at 535–36, 538. At the same time, evidence that "would have permitted the jury to specifically attribute the infliction of trauma upon [the baby] to either or both of her parents ... was notably lacking." *Debelbot II*, 308 Ga. at 168. *Debelbot* thus presented a situation in which the State's mischaracterization of its burden was "uniquely harmful" in that "accepting the compelling evidence that [the parents] had essentially equal opportunities — and no one else had any

14

opportunity at all — to inflict that trauma, in the absence of evidence suggesting that the trauma was inflicted specifically by one or the other, and irrespective of whether [the parents] colluded, the logical probability that either of them inflicted the fatal trauma would be 50 percent." Id. at 168–69. This case is nothing like that; the crime here was a murder in a parking lot in the view of multiple witnesses. Two such witnesses, Moore and Barlow, offered direct evidence of the sole defendant's guilt in the form of testimony that the defendant shot the murder victim. Although there was some evidence implicating a third witness, Rozier, in the shooting, this is a far cry from saying that Payne and Rozier had "essentially equal opportunities — and no one else had any opportunity at all" to shoot Sills. *Debelbot II*, 308 Ga. at 169.[6]

---

[6] Moreover, Rozier's version of events implicating Payne was corroborated by some of the physical evidence: evidence of a full bathtub in Rozier's apartment corroborated his testimony that he was bathing his children around the time shots were fired; the single .40-caliber live round located on Rozier's living room floor corroborated his testimony that he grabbed his gun and "cocked" it before he went outside to see what was going on; and the lack of shell casings at the scene of the shooting corroborated Rozier's testimony that Payne, the shooter, carried a revolver. In addition, although a 911 caller's description implicated Rozier, who had dreadlocks, Moore testified

15

Here, the trial court did instruct the jury that the State was "not required to prove the guilt of the accused ... to a mathematical certainty," which, as in *Debelbot*, may have reinforced the prosecutor's incorrect argument. See *Debelbot I*, 305 Ga. at 543–44. But, given the very different scenarios presented by the evidence in each case, the prosecutor's misstatement in this case was not harmful in the same way that it was in *Debelbot*. See, e.g., *Draughn v. State*, 311 Ga. 378, 383–84 (2021) (no prejudice from counsel's failure to object to State's characterization of reasonable doubt, based in part on the fact that, "unlike in *Debelbot*, the case against [the defendant] was plainly sufficient given that an eyewitness identified [him] as one of the assailants"). Payne has failed to show a reasonable probability that trial counsel's failure to object to the prosecutor's improper argument changed the outcome of the trial.[7]

that the shooter had short hair and that he did not see anyone with dreadlocks. Also, as noted above, Moore did not pick Rozier out of a lineup soon after the shooting.

[7] Payne's primary appellate brief contains a single sentence arguing that the errors he alleges "combined to deprive [him] of a fair trial under the Georgia Constitution and the United States Constitution." To the extent that

16

*Judgment affirmed. All the Justices concur.*

---

Payne argues cumulative prejudice, we have identified only one instance of ineffective assistance of counsel, and no instance of trial court error, so there are not multiple errors to aggregate, and any claim of cumulative prejudice fails. See *Jackson v. State*, 317 Ga. 139, 146 (2023).